# In the United States Court of Federal Claims

No. 14-018C
(Filed Under Seal: April 7, 2014)
Redacted Version Issued for Publication: May 22, 2014

| | |
|---|---|
| AM GENERAL, LLC, | ) |
| | ) |
| | ) Post-Award Bid Protest; Cross- |
| Plaintiff, | ) Motions for Judgment on the |
| | ) Administrative Record; Best Value |
| v. | ) Tradeoff Analysis; FAR 15.101-1; |
| | ) FAR 15.308 |
| THE UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| and | ) |
| | ) |
| GENERAL DYNAMICS ORDNANCE | ) |
| AND TACTICAL SYSTEMS, | ) |
| | ) |
| Defendant-Intervenor. | ) |
| | ) |
| | ) |

Thomas P. McLish, Washington, D.C., with whom were Robert K. Huffman, Scott M. Heimberg, and Joseph W. Whitehead, for plaintiff.

Alexander V. Sverdlov, Trial Attorney, with whom were Stuart F. Delery, Assistant Attorney General; Bryant G. Snee, Acting Director; Kirk T. Manhardt, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.

David A. Churchill, Washington, D.C., with whom were Kevin C. Dwyer, Daniel E. Chudd, Charles L. Capito, and Ethan E. Marsh, for defendant-intervenor.

OPINION[1]

---

[1]     This Opinion was originally filed under seal to protect potentially proprietary or confidential information subject to the Protective Order, at which time the parties were provided an opportunity to request redactions of any protected information.  AM General, LLC (AMG) requested redactions to which the government objected in part.  ECF Nos.

CAMPBELL-SMITH, Chief Judge

This is a post-award bid protest concerning a contract for the supply of military vehicles to the United States Special Operations Command (the agency or defendant). AM General, LLC (AMG or plaintiff) was one of two unsuccessful offerors, while General Dynamics Ordnance and Tactical Systems (GDOTS or defendant-intervenor) was the successful offeror.

AMG asserts that the agency's award to GDOTS was arbitrary, capricious, and in violation of federal procurement laws and regulations.  See Compl. ¶ 1, ECF No. 1.

---

53, 55-57.  General Dynamics Ordnance and Tactical Systems (GDOTS) requested redactions to which no party objected.  ECF No. 54.  The court accepts the redactions proposed by GDOTS regarding the percentage of work to be performed by its subcontractors, its C4ISR installation hours, and the gross vehicle weight of its vehicle. The court accepts the unopposed redactions proposed by AMG regarding pricing and C4ISR installation hours.  The court denies the opposed redactions proposed by AMG regarding its past performance rating, adjectival ratings and number of strengths and weaknesses.

Protected information is defined as "information that must be protected to safeguard the competitive process, including source selection information, proprietary information, and confidential information."  Protective Order ¶ 1, ECF No. 16.   Beyond this, the court must consider any proposed redaction against the background of a "presumption of public access to judicial records."  Baystate Techs., Inc. v. Bowers, 283 Fed. Appx. 808, 810 (Fed. Cir. 2008) (per curiam) (citing Siedle v. Putnam Invs., Inc., 147 F.3d 7, 9 (1st Cir. 1998); Poliquin v. Gard Way, Inc., 989 F.2d 527, 533 (1st Cir. 1993)); see also Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 599 (1978) (assuming that the "common-law right of [public] access" to judicial records applied to the tape recordings in that case).  The court is unpersuaded that the agency's evaluation of AMG, as represented in AMG's past performance rating, adjectival ratings, and number of strengths and weaknesses, rises to the level of protected information.  See, e.g., Allied Tech. Grp., Inc. v. United States, 94 Fed. Cl. 16, 23 n.1 (2010) (declining to redact extensive proposal and agency evaluation information), aff'd, 649 F.3d 1320 (Fed. Cir. 2011); Akal Sec., Inc. v. United States, 87 Fed. Cl. 311, 314 n.1 (2009) (declining to redact adjectival ratings as over-broad).

Redacted text is indicated as follows, XXX, with the redaction equal in length to the text redacted.  When standing alone, redacted numbers are indicated as follows, [XXX], regardless of the number of digits in the number redacted.

AMG asks this court to issue an injunction directing the agency to terminate the award to GDOTS; reevaluate the offerors' proposals in accordance with the terms of the RFP[2], applicable laws, and regulations; and conduct a new best value determination. See Compl. 42.

The parties filed cross-motions for judgment upon the administrative record, and the court heard oral argument on the parties' motions on March 19, 2014. For the reasons explained below, plaintiff's motion for judgment on the administrative record (Pl.'s Mot.) (ECF No. 36) is **DENIED**, Defendant's Motion for Judgment Upon the Administrative Record (Def.'s Mot.) (ECF No. 38) is **GRANTED** and Defendant-Intervenor's Motion for Judgment on the Administrative Record (Def.-Int.'s Mot.) (ECF No. 37) is **GRANTED**.

I.      BACKGROUND

        A.      The Vehicle and the Contract

The contract is for the design, production and delivery of a Ground Mobility Vehicle (GMV 1.1 or the vehicle) that will be internally transportable in a military cargo helicopter and used in a wide range of special operations missions, including special reconnaissance, unconventional warfare, counterterrorism, security force assistance, and counterinsurgency operations. See AR[3] Tab 29.3, at 4165. The vehicle will be designed to operate on a mixture of off-road terrain and to accept various armor and equipment configurations, depending on the mission. See AR Tab 29.3, at 4241-42, 4245-46.

The contract is a seven-year Indefinite Delivery Indefinite Quantity (IDIQ) contract, issuing Cost Plus Fixed Fee (CPFF), Cost and Firm Fixed Price (FFP) (or any combination thereof) Delivery Orders. See AR Tab 74.5, at 53146.

The solicitation was for a negotiated procurement. See AR Tab 29.3, at 53088 ¶ 4. The agency informed offerors that in making an award, the agency would "conduct a tradeoff process [in accordance with] FAR[4] 15.101-1 and Defense Federal Acquisition

---

[2]     The terms RFP (Request for Proposal) and solicitation are used interchangeably throughout the administrative record.

[3]     Administrative Record (AR), ECF No. 32.

[4]     Federal Acquisition Regulation (FAR) Part 15 governs "Contracting by Negotiation" and is codified at 48 C.F.R. § 15.000 et seq. 15.000 (2013). Section 15.101-1 addresses the "tradeoff process" that is ""appropriate when it may be in the best interest

Regulation Supplement (DFARS) Part 215 and SOFARS Part 5615."  AR Tab 74.5, at 53220 § M.1.1.  Offerors were cautioned that an award would not necessarily be made to the lowest priced Offeror.  Id.

B.     The Solicitation Timeline

The agency issued the solicitation in April 2012, see AR Tab 28.1, at 3948, and subsequently issued six amendments through January 22, 2013, see AR Tabs 31-36.[5] Seven offerors filed initial proposals, of which only three were determined to be within the competitive range: GDOTS, AMG, and Navistar Defense LLC (Navistar).  See Def.'s Mot. 7.

In January 2013, the agency sent evaluation notices to GDOTS (AR Tab 70), AMG (AR Tab 67) and Navistar (AR Tab 73), and then held face-to-face discussions with each offeror in late January 2013, see, e.g., AR Tab 66, at 52611 (AMG discussions).

Offerors submitted their second proposal, termed a Final Proposal Revision (FPR), in February 2013, see AR Tabs 40-42, following which the agency again sent each offeror an Evaluation Notice describing the agency's evaluation of the proposal, and re-opening discussions, see AR Tabs 77-79.  The agency held the second and final round of face-to-face discussions with offerors in May 2013.  See, e.g., AR Tab 83.1, at 53633 (AMG discussions).

Offerors provided their third proposal, termed an Evaluation Notice/Draft FPR 2 (EN/Draft FPR 2), in late May 2013, see AR Tabs 43 (AMG), 44 (GDOTS), 45 (Navistar), after which the agency issued its Final Evaluation Notices in late June 2013, see AR Tabs 87 (AMG), 88 (GDOTS), 89 (Navistar).

Offerors provided their fourth and final proposal, Final Proposal Revision 2 (FPR 2), on June 28, 2013.  See AR Tabs 46 (AMG), 47 (GDOTS), 48 (Navistar).

C.     Agency Evaluation Process

According to the Source Selection Plan (SSP), the

---

of the Government to consider award to other than the lowest priced offeror or other than the highest technically rated offeror."  FAR 15.101-1.

[5]     Defendant represents that the "final, conformed, version of the solicitation" is AR Tab 74.5, 53088-53237."  Def.'s Mot. 3 n.2.  The court cites to this version of the solicitation in this opinion.

> source selection organization will be comprised of a Source Selection Evaluation Board (SSEB), a Source Selection Advisory Council (SSAC), and a Source Selection Authority (SSA). The Program Executive Officer is the SSA. The SSEB will be organized into three functional teams. . . . [which] are: (1) [the] Capability Team; (2) [the] Cost/Price Team; (3) [the] Past Performance Team.

AR Tab 4, at 148.

Members of the SSEB were responsible for conducting a comprehensive review and evaluation of proposals against the solicitation requirements and the approved evaluation criteria, and ensuring that the "evaluation is based solely on the evaluation criteria outlined in the request for proposal (RFP) and not as a side-by-side comparison of any proposal against another." AR Tab 4, at 148. The SSEB evaluated each offeror's final proposal and issued the Final Proposal [] Source Selection Evaluation Board Evaluation Report (SSEB Evaluation Report) on July 16, 2013. See AR Tab 59.

Members of the SSAC were responsible for reviewing the evaluation results of the SSEB to ensure the evaluation process followed the evaluation criteria and the ratings were appropriately and consistently applied, and providing for a written comparative analysis of proposals to the SSA. See AR Tab 4, at 150.

The SSAC issued its Source Selection Advisory Council Comparative Analysis and Recommendation for Award (SSAC Comparative Analysis) on July 30, 2013. See AR Tab 55A. The SSAC recommended the SSA award the contract to GDOTS. See AR Tab 55A, at 51249. On that same day, the SSEB chairman provided an in-person briefing to the SSA, accompanied by slides. See AR Tab 61.

On August 19, 2013, the SSA issued his Source Selection Decision Document (SSDD), in which he selected GDOTS as the successful offeror. See AR Tab 54. The agency notified AMG of the SSA's decision shortly thereafter. See AR Tab 112.1, at 54104.

Both AMG and Navistar filed protests with the Government Accountability Office (GAO), which denied both protests on December 19, 2013. See AR Tab 118 (GAO decision on both protests).

D.      Solicitation Evaluation Criteria

The Solicitation informed offerors that the agency would evaluate proposals in three areas,[6] Capability, Past Performance, and Cost/Price, and further directed that the "Capability Area is significantly more important than the Past Performance Area, which is more important than the Cost/Price Area. All evaluation Areas other than Cost/Price, when combined, are significantly more important than Cost/Price."  AR Tab 74.5, at 53222 § M.2.2.

Area I, Capability, included three Factors—Factor 1 (Production), Factor 2 (Technical) and Factor 3 (Management)—with Factors 1 and 2 (Production and Technical) being of equal importance, and both significantly more important than Factor 3 (Management).  See AR Tab 74.5, at 53222 § M.2.2.1.

Factor 1 (Production), included three subfactors, Subfactor 1 (Production Approach), Subfactor 2 (Manufacturing Facilities/Key Tooling and Equipment), and Subfactor 3 (Quality System and Plan); these were listed in descending order of importance.  See AR Tab 74.5, at 53222 §§ M.2.1, M.2.2.2.

Factor 2 (Technical) had two subfactors—Subfactor 1 (Vehicle Performance) and Subfactor 2 (Systems Integration/Engineering)—of equal importance.  See AR Tab 74.5, at 53222 §§ M.2.1, M.2.2.3.

Factor 3 (Management) had three subfactors, Subfactor 1 (Workforce /Manpower Planning) and Subfactor 2 (Integrated Logistics Support), were of equal importance, and both were more important than Subfactor 3 (Small Business Subcontracting Plan).  See AR Tab 74.5, at 53222 §§ M.2.1, M.2.2.4.

The agency assigned a "combined proposal rating and proposal risk" for the entire Capability Area (all factors and their subfactors).  See AR Tab 74.5, at 53222 § M.2.6. "The proposal rating is an assessment of the offeror's approach in meeting the solicitation requirements."  Id.  "The proposal risk addresses the potential impacts of the proposed approach on performance and schedule in achieving solicitation requirements."  Id.

Evaluators identified "strengths, deficiencies, significant weaknesses and weaknesses of [each offeror's] proposal, assigned a rating for each subfactor, rolled up

---

[6]     Capability, Past Performance and Cost/Price are sometimes referred to in the administrative record as "major factors," see, e.g., AR Tab 54, at 51216 ¶ 2, sometimes as "areas," id. at 51220 ¶ 3(d), and sometimes as categories, see, e.g., Def.'s Mot. 43.  There is no distinction among the terms.

subfactor ratings into factor ratings, and then rolled up factor ratings into the overall Capability rating.  See AR Tab 74.5, at 53224 § M.3.2.

Five ratings were possible for each Capability factor and subfactor, each of which had an associated color adjectival rating.

| Table 1.  Combined Technical/Risk Ratings. | | |
|---|---|---|
| Color | Rating | Description |
| Blue | Outstanding | Proposal meets requirements and indicates an exceptional approach and understanding of the requirements.  Strengths far outweigh any weaknesses.  Risk of unsuccessful performance is very low. |
| Purple | Good | Proposal meets requirements and indicates a thorough approach and understanding of the requirements.  Proposal contains strengths which outweigh any weaknesses.  Risk of unsuccessful performance is low. |
| Green | Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of the requirements.  Strengths and weaknesses are offsetting or shall have little or no impact on contract performance.  Risk of unsuccessful performance is no worse than moderate. |
| Yellow | Marginal | Proposal does not clearly meet requirements and has not demonstrated an adequate understanding of the requirements.  The proposal has one or more weaknesses which are not offset by strengths.  Risk of unsuccessful performance is high. |
| Red | Unacceptable | Proposal does not meet requirements and contains one of more deficiencies.  Proposal is unawardable. |

AR Tab 74.5, at 53222-23 tbl. 1.

The solicitation provided further guidance as to the two types of risk it would evaluate, proposal risk and performance risk.  See AR Tab 74.5, at 53221.

Proposal Risks are those risks associated with an Offeror's proposed approach in meeting Government requirements.  Proposal Risk is assessed by the Government and is integrated into the assessment of the Capability and Cost/Price Areas.

Performance Risks are those risks associated with the probability that an Offeror will successfully perform the solicitation requirements as indicated

by that Offeror's record of past and current performance.  The Government
will assess performance risk in the Past Performance Area.

AR Tab 74.5, at 53223 § M.2.6.2.

     In Area II, Past Performance, the agency assessed the "offeror's demonstrated past
performance of contracts of a similar complexity, dollar value, and work requirement . . .
to determine the demonstrated potential for successful performance of this requirement."
AR Tab 74.5, at 53222 § M.2.3.  The agency assigned the offeror one of five different
confidence ratings, as below.

| SECTION M – Table 4. Performance Confidence Assessments | |
|---|---|
| Rating | Description |
| Substantial Confidence | Based on the offeror's recent/relevant performance record, the government has a <u>high expectation</u> that the Offeror will successfully perform the required effort |
| Satisfactory Confidence | Based on the offeror's recent/relevant performance record, the government has a <u>reasonable expectation</u> that the Offeror will successfully perform the required effort. |
| Limited Confidence | Based on the offeror's recent/relevant performance record, the government has a <u>low expectation</u> that the Offeror will successfully perform the required effort. |
| No Confidence | Based on the offeror's recent/relevant performance record, the government has <u>no expectation</u> that the Offeror will be able to successfully perform the required effort. |
| Unknown Confidence | No recent/relevant performance record is available or the offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned. |

AR Tab 74.5, at 53235 tbl. 4 (emphasis added).

     In Area III, Cost/Price, the agency assessed the total evaluated price of the
offeror's proposal.  <u>See</u> AR Tab 74.5, at 53222 § M.2.4.

     E.    Plaintiff's Complaint

     AMG filed its complaint in this court on January 6, 2014, ECF No. 1, and GDOTS
was granted the right to intervene on January 7, 2014, ECF No. 11.  Defendant filed the
administrative record (AR) on January 17, 2014.  ECF No. 32.

8

AMG asserts that the agency's best value analysis was arbitrary and capricious, see Compl. ¶¶ 53-67 (Count I), that the agency's consideration of GDOTS's subcontractors' past performance was arbitrary and capricious, id. ¶¶ 68-72 (Count II), the agency unequally, arbitrarily and prejudicially evaluated AMG and GDOTS with regard to Area I Capability, id. ¶¶ 73-87 (Count III), the agency's evaluation of AMG's proposal in Area I Capability was arbitrary and capricious, id. ¶¶ 88-152 (Count IV), and the agency's evaluation of AMG in Area II Past Performance was arbitrary and capricious, id. ¶¶ 153-66 (Count V).

## II.   STANDARD OF REVIEW

The Tucker Act grants this court jurisdiction "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement . . . without regard to whether suit is instituted before or after the contract is awarded."  28 U.S.C. § 1491(b)(1) (2012).

The term "interested party" limits standing to an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract. Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006).  [T]o prove the existence of a direct economic interest, a party must show that it had a 'substantial chance' of winning the contract.  Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013) (citing Rex Serv., 448 F.3d at 1308). Courts interpreting the substantial chance standard for standing have held that it requires a showing of "'likelihood of prevailing on the prospective bid taking the protestor's allegations as true.'" Lyon Shipyard, Inc. v. United States, 113 Fed. Cl. 347, 355 n.5 (2013) (quoting McKing Consulting Corp. v. United States, 78 Fed. Cl. 715, 721 (2007)).  Here, AMG was an actual bidder, and the court concludes that AMG's allegations, taken as true, permit it to meet the threshold showing of substantial chance necessary for standing; defendant does not contend otherwise.

The court reviews an agency's procurement decision to determine whether the decision is supported by the administrative record.  See RCFC 52.1.  The Administrative Procedure Act (APA) standard of review applies to the court's examination of an agency's decision, which means that the court will set aside an agency decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2012).

The Federal Circuit has said that "[u]nder the APA standard . . . 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2)

the procurement procedure involved a violation of regulation or procedure.'" Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).  Plaintiff must make its showing by a preponderance of the evidence. See, e.g., AmerisourceBergen Drug Corp. v. United States, 60 Fed. Cl. 30, 35 (2004).

"A bid protest proceeds in two steps." Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005). First, the court determines whether the agency acted in an arbitrary and capricious manner, without a rational basis or contrary to law. Id. The second step is to determine whether the agency's action in error was prejudicial. Id. The Appeals Court has directed that prejudice requires the protestor to show that there was a "substantial chance" it would have received the contract award, but for the agency's errors. Id. at 1353.

The court will set aside an agency's decision as arbitrary and capricious if "the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Ala. Aircraft Indus., Inc. v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (alteration in original) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

"[T]he disappointed party bears a heavy burden of showing that the award decision had no rational basis." Impresa Construzioni, 238 F.3d at 1333 (internal quotation marks omitted).  Contracting officials have wide discretion in their role in the procurement process. Id. at 1332. To surpass the threshold of arbitrary and capricious, an agency need only have "considered the relevant factors and articulated a rational connection between the facts found and the choice made." Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 105 (1983).

In turn, the court considers plaintiff's challenge to the agency's evaluation of GDOTS's Past Performance, plaintiff's challenges to the agency's evaluation of AMG's Capability, and AMG's Past Performance, and finally, plaintiff's challenges to the agency's Best Value Tradeoff Analysis.

III.    THE AGENCY'S EVALUATION OF GDOTS'S  PAST PERFORMANCE
         WAS IMPROPER

Chief among plaintiff's complaints in this bid protest was the agency's evaluation of GDOTS's past performance.  For this reason, the court first examines the agency's conduct of its past performance evaluation.

The solicitation directed offerors to provide specific information to permit the agency to evaluate the past performance of both the offeror and its "major" subcontractors.  AR Tab 74.5, at 53212-16 § L.3.3.  The agency defined "major" subcontractors as those who were "projected to perform 25% or more of the total contract effort."  Id. at 53212-13 § L.3.3.2.  Among the information to be furnished was a list of the contracts either the offeror or a subcontractor had performed.  See id.

The agency considered the past performance of GDOTS and its seven[7] subcontractors in its evaluation of GDOTS's proposal.  See AR Tab 59, at 52267-90.  The agency also considered contracts regardless of whether it had rated them relevant or not.  See id. at 52268-69 tbl. 6.

The administrative record was unclear as to which of GDOTS's subcontractors were major subcontractors.  The SSEB identified two such subcontractors, Flyer Defense, LLC (Flyer) and General Dynamics Command, Control, Communications and Computers Systems (GDC4S), see id. at 52273, 52277, while the SSAC indicated that GDOTS had one major subcontractor, see AR Tab 55A, at 51237.  Accordingly, the court directed defendant to explain, with citation to the administrative record, which of the seven subcontractors were GDOTS's major subcontractor(s) and to explain the basis on which the agency evaluated the past performance of any non-major subcontractor.  See Order 3, Feb. 18, 2014, ECF No. 41 (Feb. 18, 2014 Order).

Defendant was also directed to indicate, with accompanying citations to the administrative record, whether the agency considered contracts regardless of relevance.  See id. at 3-4.

Defendant responded with an objection and an explanation.  See Def.'s Resp. Ct. Questions, Feb. 24, 2014, ECF No. 42.  In its reply brief, defendant reiterated its objection to the court's order and provided further support for its position.  See Def.'s Reply 26-30, ECF No. 47.

The court considers whether it may review the agency's compliance with the solicitation criteria, the agency's interpretation of the solicitation, the agency's evaluation of GDOTS's non-major subcontractors, and the agency's evaluation of not relevant contracts.

---

[7]     General Dynamics Land Systems (GDLS), General Dynamics Command, Control, Communications and Computers Systems (GDC4S), General Dynamics Land Systems-Force Protection (GDLS-FP/FPI), Flyer Defense, LLC (Flyer), JWF Defense Systems (JWF), Ceradyne and SkyBridge Tactical (SkyBridge).

A.     The Court Has the Authority to Review an Agency's Compliance with
       Solicitation Criteria, and Such Review Is Appropriate in This Case

Defendant objects to the court's inquiry into whether the agency evaluated the past performance of GDOTS's subcontractors in accordance with the solicitation criteria, asserting that AMG itself failed to challenge this aspect of the proposal evaluation process in its opening brief.  See id. at 26.  Defendant argues that AMG waived any such challenge by failing to raise it earlier.  See id. at 26-28.

Defendant characterizes the court's look at whether the agency complied with the solicitation criteria as a "new challenge." Id. at 26.  The court disagrees.  Its examination of the administrative record to determine whether the agency complied with the solicitation criteria is consistent with its duty to conduct an Administrative Procedure Act (APA) review of the challenges plaintiff identified in its complaint and its motion for judgment on the administrative record.

The court considers, in turn, defendant's waiver argument, and what the APA requires of the reviewing court.

1.     Defendant's Waiver Argument Is Unpersuasive

In support of its claim that plaintiff waived an aspect of its past performance challenge, defendant relies on the Novosteel decision, in which the Federal Circuit decided that an issue raised in the reply brief by the party moving for summary judgment had not been preserved for appeal.  See id. at 27 (citing Novosteel SA v. United States, 284 F.3d 1261, 1273-74 (Fed. Cir. 2002)).  In its decision, the Federal Circuit discussed litigation fairness and said that "the non-moving party ordinarily has no right to respond to the reply brief, at least not until oral argument. As a matter of litigation fairness and procedure, then, [a later raised argument] must [be] treat[ed] . . . as waived." Novosteel, 284 F.3d at 1274.  The Federal Circuit reasoned:

> given that Novosteel did not present its retroactivity argument to the [trial court] until after it had filed its principal summary judgment brief, and given that parties must give a trial court a fair opportunity to rule on an issue other than by raising that issue for the first time in a reply brief, we conclude that Novosteel has indeed waived this argument for purposes of our review.

Id.

The Federal Circuit deems the waiver rule to be a prudential doctrine that allows

an exercise of discretion when deciding whether to consider an issue on appeal not previously decided by trial court.  See Aspex Eyewear, Inc. v. E'lite Optik, Inc., 127 Fed. Appx. 493, 497 (Fed. Cir. 2005) ("This 'waiver rule' is, however, not jurisdictional but instead prudential.  As such, [the appellate court] retain[s] broad discretion to consider issues not timely raised before the district court."); see also HTC Corp. v. IPCom GmbH & Co., 667 F.3d 1270, 1282 (Fed. Cir. 2012) ("An appellate court, however, has discretion to consider an issue for the first time on a case-by-case basis.") (citing Singleton v. Wulff, 428 U.S. 106, 120 (1976)).

Defendant cites this court's Carahsoft Technology decision for the proposition that the waiver rule applies at the trial court as well.  See Def.' Reply 27 (citing Carahsoft Tech. Corp. v. United States, 86 Fed. Cl. 325, 338 n.11 (2009)).  The plaintiff raised a number of arguments at various points during its bid protest action that it had not addressed in its complaint.  See Carahsoft Tech., 86 Fed. Cl. at 338.  The court declined to hear those arguments raised in plaintiff's response to which defendant had no opportunity to respond in writing, as well as those raised during oral argument, for which defendant was "wholly unprepared to respond."  Id.  The court did entertain, however two "new" arguments that were contemplated within allegations in the complaint, and were raised "early enough in the course of th[e] litigation that defendant had an opportunity to respond." Id. at 338 n.11.

Courts have invoked the waiver rule and elected to exclude an argument if its consideration would compromise the fairness of the litigation, such as when notice and a comment opportunity are lacking.  Both notice and a comment opportunity were provided in this case.  The issues of concern were presented to defendant by the court with its February 18, 2014 Order, well in advance of defendant's deadline of March 14, 2014 for filing a reply brief, and the March 19, 2014 oral argument.  In turn, defendant filed two written responses, and was heard at oral argument.  See Def.'s Resp. Ct. Questions; Def.'s Reply 26-30; Hr'g Tr. 41-43.

Absent evidence of unfairness, the court finds that the waiver rule does not prevent it from considering whether the agency complied with the solicitation criteria in its evaluation of GDOTS's past performance.

2.     The APA and Federal Procurement Law Require the Court to Engage in a Searching and Careful Review

A court conducting a review under 5 U.S.C. § 706 is required to engage in a "searching and careful" inquiry into the facts, without substituting its judgment for that of the agency.  Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) (emphasis added), overruled on other grounds by Califano v. Sanders, 430 U.S. 99 (1977).  The Federal Circuit has endorsed this "searching and careful" standard of

review.  See, e.g., Miami Free Zone Corp. v. Foreign-Trade Zones Bd., 136 F.3d 1310, 1316 (Fed. Cir. 1998) ("In conducting our review under 5 U.S.C. § 706, '"[a]lthough this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one."'") (quoting Overton Park, 401 U.S. at 416).

While an agency is allowed a presumption of regularity, "that presumption is not to shield [the agency's] action from a thorough, probing, in-depth review." Overton Park, 401 U.S. at 415 (emphasis added); see also Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1085 (Fed. Cir. 2001) (same).  The case law teaches that the reviewing court must consider whether the agency's evaluation comported with the solicitation criteria and federal procurement law.

The FAR tasks the SSA with the responsibility for "[e]nsur[ing] that proposals are evaluated based solely on the factors and subfactors contained in the solicitation (10 U.S.C. 2305(b)(1) and 41 U.S.C. 253b(d)(3))." FAR 15.303 (b)(4).

In Pitney Bowes, the plaintiff complained about the manner in which the agency conducted its past performance evaluation and specifically, the manner in which it considered information provided by customers in certain reference questionnaires. Pitney Bowes Gov't Solutions, Inc. v. United States, 94 Fed. Cl. 1, 14 (2010). Before considering the merits of the claim, the court observed that "the use of past performance reports must comply with the 'fundamental principle of federal procurement law that a contracting agency must treat all offerors equally and evaluate their proposals evenhandedly against the solicitation's requirements and evaluation criteria.'" Id. at 15 (quoting Brican Inc., B-402602, 2010 CPD ¶ 141, 2010 WL 2474031, at *4 (Comp. Gen. June 17, 2010)).

Similarly, in Vanguard, the court considered plaintiff's argument that it had suffered disparate treatment from other offerors during the agency's evaluation of its past performance. Vanguard Recovery Assistance v. United States, 101 Fed. Cl. 765, 767-68 (2011).  Plaintiff's claim was premised on the agency's award of strengths to offerors whose performance was similar to plaintiff's, but whose ratings exceeded plaintiff's. Id. at 788. The court considered plaintiff's complaint noting that "'uneven treatment goes against the standard of equality and fair-play that is a necessary underpinning of the federal government's procurement process and amounts to an abuse of the agency's discretion.'" Id. (quoting PGBA, LLC v. United States, 60 Fed. Cl. 196, 207 (2004), aff'd, 389 F.3d 1219 (Fed. Cir. 2004)); see also TLT Constr. Corp. v. United States, 50 Fed. Cl. 212, 216 (2001) ("A fundamental principle of government procurement is that [contracting officers] treat all offerors equally and consistently apply the evaluation factors listed in the solicitation." (citing 10 U.S.C. § 2305 (1999))).

14

3.      The Agency Did Not Evaluate GDOTS's Subcontractors According
        to the Solicitation Criteria

The SSA represented that his "evaluation was conducted [in accordance with] the Source Selection Plan (SSP) and the criteria established in the RFP."  AR Tab 54, at 51217 ¶ 2.  In its motion for judgment on the administrative record, however AMG alleged unequal treatment with regard to how the agency considered past performance, stating that "both the SSAC and SSA went out of their way to downplay the significance of GDOTS's poor past performance record."  Pl.'s Mot. 29.

Defendant and GDOTS filed cross-motions for judgment on the administrative record.  Both argued that the agency's decision was made in accordance with the evaluation criteria in the solicitation.  Defendant asserted that the "administrative record fully supports the agency's decision." Def.'s Mot. 1.  GDOTS asserted that the agency's decision complied with the source selection criteria because "[t]he Source Selection Decision Document properly reflects a comparative assessment of proposals against the evaluation criteria," Def.-Int.'s Mot. 10 (capitalization altered), and the "[SSA] and the [SSAC] properly assessed the positive past performance of GD-OTS' subcontractors," Id. at 22 (capitalization altered).

Each of the parties in this action has directed the court's attention to the specific pages of the SSEB Evaluation Report and the SSAC Comparative Analysis in which the agency provided a table summarizing the contracts it evaluated for GDOTS and its subcontractors.  See Pl.'s Mot. 31, 33 (citing SSEB Evaluation Report, AR Tab 59, at 52268-69); Pl.'s Mot. 33, 35 (citing SSAC Comparative Analysis, AR Tab 55A, at 51238-39); Def.'s Mot. 40 (same); Def.-Int.'s Mot.19 n.5, 27 (same).

It is facially apparent from a review of this table that the agency did not evaluate GDOTS's subcontractors in accordance with the criteria set forth in section[8] L.3.3.2. Because GDOTS was expected to perform [XXX]% of the contract effort itself, see AR Tab 55A, at 51237, no more than [XXX]% of the work could be performed by subcontractors.  Thus at most, GDOTS could have only two major subcontractors. Arithmetically, it is not possible that the seven listed subcontractors could each perform at least 25% of the contract effort, and thereby be deemed a major subcontractor under section L.3.3.2.  This finding merits further examination.

---

[8]      The solicitation refers sometimes to sections and sometimes to paragraphs within Sections L and M.  There is no distinction.  The opinion will refer to section, simply for consistency.

4.      Conclusion

It is difficult to reconcile the government's position on waiver with the requirement that the reviewing court conduct an inquiry into the facts that is "searching and careful."  After close consideration of the government's objection, the court is satisfied not only that it may inquire properly into whether the agency complied with the solicitation criteria in its evaluation of GDOTS's past performance, but that it must do so here based on the agency's documented conduct.

B.      The Agency Misinterpreted the Solicitation Requirements

Section L.3.3.2 of the Solicitation provides:

> The Offeror shall submit a maximum of five (5) and a minimum of three (3) Performance Information Sheets identifying active or completed contracts, either Government or commercial, for each prime, and a maximum of five (5) and a minimum of one (1) Past Performance Information Sheet for each major subcontractor, teaming partner, and/or joint venture ("major" is defined as those subcontractors, teaming partners, or joint ventures who are projected to perform 25% or more of the total contract effort.)

AR Tab 74.5, at 53212-13 § 3.3.2.

1.      Defendant's Position on Ambiguity

Defendant interprets section L.3.3.2 to permit an offeror to submit any number of contracts for the agency's evaluation of proposed non-major subcontractors.  See Def.'s Reply 28-30.  But defendant acknowledges that the solicitation limited the number of contracts the offeror could submit for its own evaluation or that of a major subcontractor. See id. at 28.  According to defendant,

> [o]n its face, the solicitation contains absolutely no limits on the type of information that could be submitted for non-major subcontractors. It merely states that [] offerors 'shall submit a maximum of five (5) and a minimum of three (3) Performance Information Sheets . . .  for each prime, and a maximum of five (5) and minimum of one (1) Past Performance Information Sheet for each major subcontractor, teaming partner, and/or joint venture." Tab 74.5 AR 53212-13.  This text demonstrates that when the agency wanted to set limits on the amount of information the offerors wanted to submit, it knew how to do so.  That the solicitation does not

16

identify <u>any</u> such limits for non-major contractors indicates that the agency
did not intend to place any such limits at all.

<u>Id.</u>

Alternatively, defendant argues that if the court were to find plaintiff's
interpretation of the solicitation criteria to be reasonable (namely that limits exist), the
court would find only a "possible interpretation of an ambiguous provision." <u>Id.</u> at 30.  In
such circumstances, defendant argues, plaintiff was obligated to have sought clarification
during the solicitation process, <u>see id.</u> (citing <u>Blue & Gold v. United States</u>, 492 F.3d
1308, 1313 (2007)), and if plaintiff failed to do so, its failure precludes the court from
accepting the party's interpretation, <u>id.</u> (citing <u>Linc Gov't Servs. v. United States</u>, 96 Fed.
Cl. 672, 709 (2010)).

2.      Legal Standards Governing Interpretation of Solicitation Provisions

Interpretation of the agency's solicitation is a question of law for the court.  <u>See
Banknote Corp.</u>, 365 F.3d at 1353; <u>see also</u> <u>Contract Servs., Inc. v. United States</u>, 104
Fed. Cl. 261, 274 (2012) (same).

"The principles governing interpretation of Government contracts apply with
equal force to the interpretation of solicitations issued by the Government for such
contracts."  <u>Banknote Corp.</u>, 365 F.3d at 1353 n.4.  A court must "consider the
solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable
meaning to all of its provisions."  <u>Banknote Corp.</u>, 365 F.3d at 1353; <u>see also</u> <u>NVT
Techs., Inc. v. United States</u>, 370 F.3d 1153, 1159 (Fed. Cir. 2004) ("An interpretation
that gives meaning to all parts of the contract is to be preferred over one that leaves a
portion of the contract useless, inexplicable, void, or superfluous.").

"A contract is ambiguous if it is susceptible of two different and reasonable
interpretations, each of which is found to be consistent with the contract language."
<u>Community Heating & Plumbing Co., Inc. v. Kelso</u>, 987 F.2d 1575, 1579 (Fed. Cir.
1993); <u>see also</u> <u>C. Sanchez and Son, Inc. v. United States</u>, 6 F.3d 1539, 1544 (Fed. Cir.
1993) (same).  "The court must consider the meaning that a reasonable person acquainted
with the contemporaneous circumstances would ascribe to the document's text."
<u>Carahsoft Tech.</u>, 85 Fed. Cl. at 339-40.  That the parties disagree on the interpretation of
a term is not necessarily evidence of ambiguity.  <u>See</u> <u>C. Sanchez and Son</u>, 6 F.3d at 1544.

"An ambiguity is latent if it is not apparent on the face of the solicitation and is not
discoverable through reasonable or customary care."  <u>See</u> <u>Linc Gov't Servs.</u>, 96 Fed. Cl.
at 708.  A latent ambiguity is "resolved against the government as drafter of the
solicitation."  <u>Linc Gov't Servs.</u>, 96 Fed. Cl. at 708-09.  A patent ambiguity is "present

17

when the contract contains facially inconsistent provisions that would place a reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties." Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1381 (Fed. Cir. 2000). Such an ambiguity is "obvious, gross, or glaring." Archura LLC v. United States, 112 Fed. Cl. 487, 500 (2013) (citing Fulcra Worldwide, LLC v. United States, 97 Fed. Cl. 523, 538 (2011); H & M Moving, Inc. v. United States, 499 F.2d 660, 671 (Ct. Cl. 1974)).

The waiver rule applies only to patent ambiguities:

a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims.

Blue & Gold, 492 F.3d at 1313 (emphasis added).

3.      The Solicitation Permitted Offerors to Submit Past Performance Information for Only Itself and Its Major Subcontractors

Defendant is correct that section L.3.3.2 "must be interpreted 'in a manner that harmonizes and gives reasonable meaning to all its provisions.'" Def.'s Reply 29-30 (citing Banknote Corp., 365 F.3d at 1353). Defendant's interpretation, however, fails to consider the solicitation as a whole, and defendant fails to harmonize its interpretation of the past performance information an offeror could provide (§ L.3.3.2) with the agency's specification for the contents of the entire Past Performance Volume (§ L.3.3.1).

Section L.3.3.1 specifies the contents of the Past Performance Volume, as follows:

L.3.3.1 Contents.   The offeror shall submit a Past Performance Volume containing the following:

a. Table of Contents
b. Summary Page describing the role of the Offeror and each subcontractor, teaming partner, and/or joint venture partner that the Offeror is required to provide Past Performance Information Sheets [in accordance with section] L.3.3.2 below.
c. Past Performance Information Sheets, [as described in section] L.3.3.2 below.

AR Tab 74.5, at 53212 § L.3.3.1 (emphasis added).

18

Defendant's interpretation of section L.3.3.2 is at odds with section L.3.3.1(b).  As construed by defendant, an offeror could submit a Past Performance Volume with a summary page in which it correctly described <u>only</u> the roles to be played by itself and its major subcontractors, as directed in section L.3.3.1(b), but then could also include contract information for an infinite number of its non-major subcontractors, under its interpretation of section L.3.3.2.

The purpose of the Past Performance Volume summary page is to provide the agency with information for those entities for which offeror provided past performance information sheets.  The plain text of the solicitation favors such an interpretive read.  Defendant's interpretation of section L.3.3.2, however, would appear to contravene this purpose because the agency would receive a summary of the roles of some, but not all, subcontractors for which the offeror provided past performance information sheets.

Interpreted as defendant urges, section L.3.3.2 would limit to five the number of contracts an offeror could provide for itself and its major subcontractors, <u>see</u> Def.'s Reply 28, while allowing an offeror to put forward an unlimited number of contracts for non-major subcontractors.  Asserting that this proposed interpretation is consistent with the overall scheme of the solicitation, defendant explains that "[a]lthough the agency wanted offerors to have an even playing field to demonstrate the records of the most important members of the team—those that would perform the most work— it still wanted to afford offerors (and itself) flexibility to come up with a comprehensive portrait of offerors' past performance." <u>Id.</u> at 29.

If accepted, defendant's interpretation of section L.3.3.2, hypothetically, would allow an offeror the "flexibility" to award some portion of work to numerous subcontractors with known positive past performance histories, for the sole purpose of boosting its past performance rating.[9]  A past performance rating inflated in this manner would quickly become meaningless for its intended purpose, a consideration of "the Offeror's demonstrated record of performance in providing services and products that meet the users' needs."  AR Tab 74.5, at 53234 § M.3.3.

Defendant's suggested interpretation of section L.3.3.2 is also inconsistent with the negative implication canon, <u>expressio unius est exclusio alterius</u>, which counsels "that to express or include one thing implies the exclusion of the other, or of the alternative." <u>Black's Law Dictionary</u> 661 (9th ed. 2009).  The agency expressly included both the offeror and major subcontractors in section L.3.3.1 and section L.3.3.2, but said nothing of non-major subcontractors in either section.  Under this canon of construction, the

---

[9]      In offering this hypothetical, the court does not suggest that such behavior is present in this case.

agency's express inclusion of major subcontractors implies that the alternative, non-major subcontractors, are excluded.

Defendant argues that when "the agency <u>wanted</u> to set limits on the amount of information the offerors wanted to submit, it knew how to do so," in support of its argument that the agency placed no limit on the number of contracts for non-major subcontractors.  Def.'s Reply 28.  In the court's view, the better read of the solicitation is that when the agency wanted to evaluate the past performance of certain subcontractors, it knew how to direct the offeror to provide information for those subcontractors.

Moreover, defendant's proposed interpretation of section L.3.3.2 is contrary to the limits on a proposal evaluation set forth in FAR15.305(a)(2)(iii), which states in its entirety,

> [t]he evaluation should take into account past performance information regarding predecessor companies, key personnel who have relevant experience, or <u>subcontractors that will perform major or critical aspects of the requirement</u> when such information is relevant to the instant acquisition.

FAR15.305(a)(2)(iii) (emphasis added).

Defendant's additional argument that section L.3.3.2 puts offerors on notice that the agency would consider both information provided by the offeror <u>and</u> information the agency collected on its own is similarly unavailing.  <u>See</u> Def.'s Reply 29.  The language to which defendant points states that "[o]fferors are cautioned that the Government will use the information provided by each Offeror in this volume <u>and information obtained from other sources</u> for the overall evaluation of past performance."  AR Tab 74.5, at 53213 § L.3.3.2 (emphasis added).  Defendant leaves unexplained how the agency's caution to offerors that it would not limit itself to information provided by the offeror, serves as authorization to the offeror to provide any information it wishes for non-major subcontractors.

The court is not convinced that a reasonable person acquainted with the solicitation would interpret section L.3.3.2 as defendant does.  Nothing in the solicitation or the FAR provides defendant with support for its position that the solicitation permitted the agency to evaluate the past performance of any subcontractor, regardless of whether the subcontractor was a major performer or not.

For the sake of completeness, however, the court evaluates defendant's second argument, regarding ambiguity.  As defendant relies only on case law addressing patent ambiguities, <u>see</u> Def.'s Reply 30 (citing <u>Blue & Gold</u>, 492 F.3d at 1313; <u>Linc Gov't</u>

Servs., 96 Fed. Cl. at 709), the court understands defendant's position with regard to ambiguity as follows: if the solicitation contains an ambiguity, it is a patent ambiguity. But defendant did not point to provisions in the solicitation that could be said to be facially inconsistent.  Nor does the court's examination of sections L.3.3.1 and L.3.3.2, reveal any language that on the face of the solicitation, could be considered an "obvious, gross, or glaring" ambiguity.

### 4.    Conclusion

The court finds that the disputed provision in the solicitation, section L.3.3.2, is not ambiguous.  The solicitation permitted offerors to submit past performance information for only itself and its major subcontractors.  To the extent that section L.3.3.2 could be construed ambiguous, the court finds that it is a latent ambiguity—not a patent ambiguity—and thus must be interpreted against defendant, as the drafter of the solicitation.[10]

### C. The Agency Improperly Considered the Past Performance of GDOTS's Subcontractors

The agency included the past performance of GDOTS' seven subcontractors in calculating GDOTS's past performance rating, see AR Tab 59, at 52268-69 tbl. 6, of which only one, Flyer, was a major subcontractor, see id. at 52273; see also Def.'s Resp. Ct. Ques. 4.

The solicitation's criteria permitted the agency to consider past performance information for Flyer, but not for General Dynamics Land Systems (GDLS), General Dynamics Command, Control, Communications and Computers Systems (GDC4S), General Dynamics Land Systems-Force Protection (GDLS-FP/FPI), JWF Defense Systems (JWF), Ceradyne or SkyBridge Tactical (SkyBridge).

---

[10]    The court notes that the agency had notice that offerors interpreted the solicitation criteria differently in June 2012, upon the receipt of the initial proposals.  In its initial proposal, GDOTS provided past performance information for all seven subcontractors. See AR Tab 38.3, at 30693-94.  Navistar, on the other hand, noted that it provided no past performance information sheets for either of its two "strong" subcontractors, as neither met the definition of a major subcontractor in section L.3.3.2.  AR Tab 39.3, 33254 ¶ 11. As the agency did not close discussions with offerors until May 2013, see Def.'s Mot. 7, it had time to resolve the problem and ensure that all offerors received an equal opportunity to submit and be evaluated on the same measure of material.

The agency considered a total of eight contracts for these six non-major subcontractors, none of which it should have considered.  See AR Tab 59, at 52268-69 tbl. 6.

The court finds that the agency's evaluation of the past performance of GDOTS was contrary to the criteria set forth in the solicitation.

> D.   The Agency's Evaluation of Not Relevant Contracts in Its Past Performance Rating of GDOTS Was in Error

In its evaluation of GDOTS's subcontractors, the agency considered three contracts for GDOTS's major subcontractor, Flyer, that it rated Not Relevant.  See AR Tab 59, at 52268; Def.'s Resp. Ct. Ques. 10-12.

Defendant argues that the agency was required to consider information about all contracts, including those it rated Not Relevant, when it determined the offeror's overall past performance confidence rating.  See Def.'s Reply 30.  Defendant points to the solicitation and says "the agency was required to consider [not relevant contracts] by Section M" (Evaluation Factors for Award).  Id.  (citing AR Tab 74.5, at 53234 § M.3.3.1) (stating that the agency "will conduct an in-depth review and evaluation of all performance data obtained to determine how closely the work performed under those efforts relates to the current requirement." (emphasis added)).

The relevant portion of Section M is as follows:

> M.3.3 Past Performance.  The Past Performance evaluation considers the Offeror's demonstrated record of performance in providing services and products that meet the users' needs.  Past Performance evaluation shall focus on the recency and relevancy as defined in Section L.3.3 regarding how well the Contractor performed or is performing the same or similar type of work under other Government contracts.

> M.3.3.1  The Government will conduct an in-depth review and evaluation of all performance data obtained to determine how closely the work performed under those efforts relates to the current requirement.  The performance evaluation will be based on the data gathered by information sheets, questionnaires, and interviews, submitted SF 294/295s, and the Contractor Performance Assessment Reporting System reports as available through the Past Performance Retrieval System.  The Government is not limited to these resources.

> M.3.3.2  The Government will evaluate the present and past performance of the efforts (that meet the recency and relevancy criteria in Section L.3.3) in order to determine the Government's overall level of confidence in the Offeror's ability to successfully perform the required effort.   The Confidence Ratings with definitions that will be utilized are contained within Table 4 below.

AR Tab 74.5, at 53234 § M.3.3 (emphasis added).

Section L.3.3 (incorporated into section M.3.3.2) says, in relevant part, "[f]or proposed subcontractors/teaming partners, relevancy is defined by that which reflects experience in the area of expertise the subcontractor is projected to actually perform under the GMV 1.1 program, (i.e. specific areas in the PWS/SOW)." Id. at 53215 § L.3.3.5.2.

The agency's definition for a Very Relevant rating was that "Present/Past Performance effort involved essentially the same scope and magnitude of effort and complexities this solicitation requires." Id. at 53215 § L.3.3.5.3 (emphasis added).  The scope and magnitude of effort required for a Relevant rating was "similar," for a Somewhat Relevant rating "some," and for a Not Relevant rating "involved little or none." Id.

Defendant points to PHT Supply Corporation v. United States for the proposition that the agency did not err in considering "not relevant" contracts. 71 Fed. Cl. 1, 15-16 (2006).  The court in PHT Supply considered the plain language of a solicitation that read: "In conducting the past performance evaluation, . . . [t]he Government may consider the currency, degree of relevance, source and context of the past information it evaluates as well as general trends in performance." Id. at 15 (emphasis added).  The court found that the agency did not err in considering not relevant contracts, as such contracts were suitable for the evaluation of general trends, see id. at 12, and a refusal to consider them would read the clause—general trends in performance—out of the solicitation, see id. at 15.  The court's decision in PHT Supply was based on the language of the solicitation, which is different from the language in this solicitation.  Thus the PHT Supply case is inapposite on the facts of this case.

Defendant takes the position that the Not Relevant rating reflected the weight to be given to that contract in the past performance confidence rating.  See Def.'s Reply 30.  But the SSEB's analysis of GDOTS's past performance twice stated that the ratings for its subcontractors were very positive, with no mention that three of those contracts were not relevant.  See AR Tab 59, at 52267.  Likewise, the SSAC focused on the positive evaluations of GDOTS's subcontractors and remained silent as to the relevance levels of those contracts.  See AR Tab 55A, at 51237.  In the SSDD, the SSA did note that

GDOTS lacked relevant contracts for review, see AR Tab 54, at 51218, and that only one of the presented contracts was rated as Very Relevant. Id. But the SSA declined to address the Not Relevant rating for some of GDOTS's subcontractor's contracts, mentioning only their "strong performance." Id.

The question of whether Not Relevant contracts were properly considered in the agency's evaluation is a matter of interpretation of Section M of the solicitation, which is a matter of contract interpretation for the court. See Banknote Corp., 365 F.3d at 1353. A court "must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions." Id.; see also NVT Techs., 370 F.3d at 1159 ("An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous.").

Evaluating past performance is a two-step process, with the agency first evaluating an offeror's contracts and then the offeror. Considering sections M.3.3.1 and M.3.3.2 together, the court reads these sections as conducting two different evaluations: in section M.3.3.1, the agency evaluates each contract and assigns it a relevancy rating (Very Relevant, Relevant, Somewhat Relevant, or Not Relevant), and in section M.3.3.2, the agency evaluates each offeror and assigns it a performance confidence rating from Table 4, in section M.3.3, (Substantial Confidence, Satisfactory Confidence, Limited Confidence, or No Confidence). See AR Tab 74.5, at 53234-35.

Defendant's interpretation of section M.3.3.1 is correct, the agency was required to review and evaluate "all performance data obtained," as it assigned each contract a relevancy rating. Id. at 53234. But section M.3.3.1 did not direct the agency to consider all contracts when it assigned the offeror a past performance confidence rating. Under defendant's interpretation, the clause "that meet the recency and relevancy criteria in Section L.3.3" in section M.3.3.2 would be useless. Considering the plain text of section M.3.3.2, for a contract to "meet" the relevancy criteria means there is a standard, in particular the section L.3.3 recency and relevancy criteria, against which the agency evaluates contracts to determine if it will consider that contract in the section M.3.3.2 evaluation of the offeror. Those contracts that fail to meet the Section L.3.3 criteria are thus excluded from the section M.3.3.2 evaluation.

The court finds that Section M.3.3 of the solicitation did not permit the agency to consider contracts it rated Not Relevant in its determination of an offeror's past performance confidence rating.

The court finds that the agency erred in its consideration of three Not Relevant contracts for Flyer in its determination of GDOTS past performance confidence rating.[11]

Given the court's findings, it is unnecessary to reach plaintiff's arguments that the agency double-counted the positive past performance of GDOTS's subcontractors, or that the agency overstated the strength of GDOTS's subcontractors' past performance. See Pl.'s Mot. 29-36.

## IV.   THE AGENCY'S EVALUATION OF AMG'S AREA I CAPABILITY

AMG also challenged one or more of the agency's ratings for its Area I Capability Factor 1 (Production), Factor 2 (Technical) and Factor 3 (Management) evaluations. The court addresses these challenges first before turning to consider plaintiff's challenge to the agency's evaluation of its Past Performance, and then its challenge to the agency's Best Value Tradeoff Analysis.

The undersigned considers plaintiff's arguments in the order in which they were presented.

### A.   The Agency's Evaluation of Capability, Factor 3 (Management) Was Rational

Plaintiff asserts that the agency's evaluation of its proposal on Capability Factor 3 (Management) was arbitrary, capricious, contrary to law and reflected disparate treatment of the offerors. See Pl.'s Mot. 41, 63-64. Plaintiff's complaint is three-fold: first, when the agency "rolled up" the underlying subfactor ratings into the Factor 3 rating, it applied a different rule for GDOTS than for the other offerors. See id. at 39-40. Second, when awarding factor ratings, the agency was not consistent in its treatment of offerors as to the number of strengths needed to receive an Outstanding factor rating. See id. at 40-41. And third, the agency improperly downgraded AMG's rating on Factor 3 from an Outstanding rating to a Good rating, although there had been no change in the underlying subfactor ratings. See id. at 63-64. Plaintiff asserts that prior to this downward adjustment in rating, the agency misled AMG during discussions, by not giving AMG either notice of the impending downgrade or an opportunity to respond. See id. at 41, 64.

Defendant replies that the agency did not treat offerors differently in the manner in which it rolled-up subfactor ratings into factor ratings, or in the way in which it considered the number of strengths in determining whether to award an Outstanding rating. See Def.'s Mot. 14-18. While defendant acknowledges downgrading plaintiff's

---

[11]   Defendant correctly notes that the agency also considered one Not Relevant contract for AMG. See Def.'s Resp. Ct. Ques. 12 (citing AR Tab 59, at 52384).

Factor 3 rating, it asserts that it did so to correct an error in its initial evaluation rating; defendant maintains that there were no misleading discussions.  See id. at 34-36.

The court considers plaintiff's arguments in turn.

> 1.     The Agency Employed a Consistent Approach to Rolling Up
>         Subfactor and Factor Ratings

Plaintiff asserts that the agency had an internal rule governing the manner in which it would roll up subfactor ratings into factor ratings, and that it failed to apply this rule uniformly.  See Pl.'s Mot. 39-40.  The rule, according to plaintiff, was that if an offeror received an Acceptable rating on any subfactor, the subfactor ratings could not be rolled up to an Outstanding factor rating.  See id. at 39.

According to plaintiff, evidence of this rule may be found in a statement included in the Contracting Officer's[12] Statement of Facts, that defendant provided to the GAO during plaintiff's GAO protest.  See id.  (quoting AR Tab 117 (Tab 2), at 55596).

Defendant responds that no such rule exists, and that the contracting officer expressly stated as much when she said that the "[g]overnment's evaluation is a subjective assessment of the merit of the offeror's proposal."  Def.'s Mot. 14-15 (quoting AR Tab 117 (Tab 2), at 55595-96).  As the contracting officer explained:

> [i]t is not surprising that nowhere does it state, ". . . an Outstanding rating on a factor is impermissible if an Acceptable rating is given on a subfactor . . ." The Government's evaluation is a subjective assessment of the merit of the offeror's proposal. . . . In any event, however the Protestor was not prejudiced by the roll-up error as even if the rating for Factor 3 was raised to Outstanding [which would obviously require AMG to provide extraordinary commitment on behalf of the Subfactor 3 small business], the overall rating for the Capability Area would still remain at Good (1 Good, 1 Acceptable, and 1 Outstanding Factor ratings . . .  can only roll up to an overall Good rating.)

AR Tab 117 (Tab 2), at 55595-96 (emphasis added).

---

[12]    The contracting officer has a broad set of responsibilities with regard to the solicitation, including working with the SSEB Chair to ensure the evaluation is conducted in accordance with the evaluation criteria specified in the solicitation.  See AR Tab 4, at 150 ¶ 2.2.2 (3).

Review of the contracting officer's statement shows that she was not discussing a general rule. Rather, she was responding to a protest by AMG—that the agency "arbitrarily downgraded AMG's rating from Outstanding to Good,"—AR Tab 117 (Tab 2), at 55594—and in the context of that response, offered her opinion on why AMG could not have suffered prejudice. Even if AMG managed to get an Outstanding rating on Factor 3, when Factors 1, 2 and 3 were rolled up to the overall Capability rating, the Capability rating would still have been Good, not Outstanding. Although not expressed in the excerpted statement from the contracting officer, she would have been familiar with and informed by the solicitation weights, as provided in the solicitation. (In the Capability Area, Factor 1 (Production) and Factor 2 (Technical) are of equal importance, and both are significantly more important than Factor 3 (Management). See AR Tab 74.5, at 53222 § M.2.2.1.)

On this administrative record, the court finds that the agency neither adopted nor employed a rule precluding an Outstanding factor rating if the factor included any subfactor Acceptable ratings. Nonetheless, the court considers plaintiff's complaint that the agency treated the offerors unequally.

a.    GDOTS Overall Capability Rating

Plaintiff compares the manner in which the agency rolled up its subfactor ratings into its Factor 3 rating with two roll ups of GDOTS's ratings, first its overall Capability rating, and then its Factor 1 rating. See Pl.'s Mot. 39-40. The court addresses the former in this section and the latter in section immediately following.

The table below provides a comparison of evaluation ratings and weights of AMG's Factor 3 with GDOTS's Capability rating.

| Comparison of AMG's Factor 3 and GDOTS's Capability Ratings | | | | | |
|---|---|---|---|---|---|
| AMG | | | GDOTS | | |
| | Rating | Relative Weight | | Rating | Relative Weight |
| Factor 3 (Management) | Good | | Area I (Capability) | Outstanding | |
| Subfactor 1 | Outstanding | Equal importance | Factor 1 | Outstanding | Equal importance |
| Subfactor 2 | Outstanding | Equal importance | Factor 2 | Outstanding | Equal importance |
| Subfactor 3 | Acceptable | Less important | Factor 3 | Acceptable | Significantly less important |

AR Tab 59, at 52230-31, 52341; AR Tab 74.5, at 53222 §§ M.2.2.1, M.2.2.4.

Review of the relative weights shows GDOTS's overall Capability rating is not like AMG's Factor 3 rating.  In GDOTS's case, the one factor on which it received an Acceptable rating was <u>significantly less important</u> than the two factors on which it received Outstanding ratings.  In AMG's case, the one subfactor on which it received an Acceptable rating was <u>less important</u> than the two factors on which it received an Outstanding rating.

Defendant is correct that the weights explain the outcome, as in AMG's case, "<u>the</u> 'Acceptable' rating counted for more in the overall average."  Def.'s Mot. 17 (emphasis omitted).

When considering a challenge to an agency's action, the reviewing courts must determine whether "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion."  <u>Impresa Construzioni</u>, 238 F.3d at 1332-33 (quotation omitted).

The record shows that due to the different weights of the underlying subfactors or factors, AMG's Acceptable subfactor rating simply had more of an impact on its rolled up Factor 3 rating than GDOTS Acceptable Factor 3 rating had on its own rolled up Capability rating.  The court finds defendant's explanation to be reasonable.

b.    GDOTS Factor 1 Rating

The agency rated GDOTS Outstanding on Subfactors 1 and 2, Acceptable on Subfactor 3, and rolled up these subfactor ratings into an overall Factor 1 rating of Outstanding.  <u>See</u> AR Tab 59, at 52231.  The table below provides a comparison of AMG's Factor 3 rating with GDOTS's Factor 1 rating.

| Comparison of AMG's Factor 3 and GDOTS's Factor 1 Ratings | | | | | |
|---|---|---|---|---|---|
| AMG | | | GDOTS | | |
| | Rating | Relative Weight | | Rating | Relative Weight |
| Factor 3 (Management) | Good | | Factor 1 (Production) | Outstanding | |
| Subfactor 1 | Outstanding | Equal importance | Subfactor 1 | Outstanding | First importance |
| Subfactor 2 | Outstanding | Equal importance | Subfactor 2 | Outstanding | Second importance |

| Comparison of AMG's Factor 3 and GDOTS's Factor 1 Ratings | | | | | |
|---|---|---|---|---|---|
| AMG | | | GDOTS | | |
| | Rating | Relative Weight | | Rating | Relative Weight |
| Subfactor 3 | Acceptable | Less important | Subfactor 3 | Acceptable | Third importance |

AR Tab 59, at 52230-31, 52341; AR Tab 74.5, at 53222 §§ M.2.2.2, M.2.2.4.

Defendant again points to the different weights as the explanation for the different result, see Def.'s Mot. 16-17, and argues that GDOTS's Subfactor 3 rating was "'significantly less important' than the areas in which GDOTS received its 'Outstanding' scores—as a result, the 'Acceptable' rating counted for more in the overall average." Def.'s Reply 17 (emphasis omitted). Defendant maintains that "the agency did not apply any rigid mathematical formula in determining the offerors' ratings.[13] The final roll-up was a qualitative evaluation that properly accounted for the relative significance of the different subfactors." Def.'s Mot. 35 n.8.

In this case, however, the relative weight to afford "less important" Subfactor 3 and the "third most important" Subfactor 3 is less clear. In addition, defendant does not address the fact that in GDOTS's case, its Subfactor 2 Outstanding rating was less important than its Subfactor 1 Outstanding rating, while in AMG's case, both its Subfactor 1 and 2 Outstanding ratings were of equal importance.

The agency's decision to rollup AMG's subfactor ratings to a Good rating, while rolling up GDOTS's subfactor ratings to an Outstanding rating, can stand if the "agency provided a coherent and reasonable explanation of its exercise of discretion." Impresa Construzioni, 238 F.3d at 1332-33. "If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quotation marks omitted).

---

[13]    The lack of clarity regarding the comparative weight of the respective subfactors prompted each party to offer a method for calculating a numerical value for each rolled up factor. Each party assigned a value to each subfactor commensurate with the weight of the subfactor, and then tallied the subfactor values to get a numerical result. See Def.'s Mot. 35 n.8; Def.-Int.'s Mot. 32 n.8; Pl.'s Reply 24; Def.'s Reply 4-5. However, because the agency did not employ a numerical ranking method in rolling up the subfactors, see Def.'s Mot. 35 n.8, the court does not consider the parties' numerical demonstratives.

The court agrees with defendant that the ratings merely reflect a broader qualitative assessment.  See Def.'s Mot. 35 n.8.  The law counsels that reviewing courts give the greatest deference possible to these determinations on technical matters, in recognition of the special expertise of procurement officials. See E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996); J.C.N. Const., Inc. v. United States, 107 Fed. Cl. 503, 510 (2012); Beta Analytics Int'l, Inc. v. United States, 67 Fed. Cl. 384, 395 (2005).

Here, the court does not find defendant's explanation of its reliance on the different subfactor weights to be unreasonable.  Nor does the court find that the agency treated AMG unequally when it rolled up AMG's subfactor ratings into the Factor 3 (Management) rating.

> 2.      There Was No Disparate Treatment of AMG's and GDOTS's Relative Strengths

Plaintiff next argues that the agency treated it unequally when it awarded GDOTS an Outstanding rating for Factor 1, on which GDOTS earned eight strengths, while AMG received only a Good rating on Factor 3, despite having also earned eight strengths.  See Pl.'s Mot. 40-41.  Plaintiff observes that it received all eight strengths on Subfactors 1 and 2, which were equally weighted as the most important subfactors, while GDOTS received only five of its strengths on its most important subfactor.  See Pl.'s Reply 23.  Thus, given the greater weight of the subfactors on which it earned its strengths, asserts plaintiff, it merited an Outstanding rating.  See id.

Defendant responds that there is no "quantitative number of strengths or weaknesses which lend[s] itself to a certain overall rating."  Def.'s Mot.17 (quoting Contracting Officer's Statement of Facts at GAO, AR Tab 117 (Tab 2), at 55595).  Rather, defendant contends that the evaluation team awards a rating based on its "subjective discretion."  Id. at 17-18.

As provided in the SSP, SSEB evaluators are responsible for assigning evaluation ratings after having conducted "a comprehensive review and evaluation of proposals against the solicitation requirements and the approved evaluation criteria."  AR Tab 4, at 151 ¶ 2.2.6.

The solicitation informs offerors that evaluation of the Capability Area "shall focus on the strengths, deficiencies, significant weaknesses, and weaknesses of the Offeror's proposal. The Government will roll up Subfactor ratings into an overall rating for the applicable Factor, and roll up Factor ratings into an overall rating for this Area."  AR Tab 74.5, at 53224.  The solicitation defines an Outstanding evaluation rating as:

"[p]roposal meets requirements and indicates an exceptional approach and understanding of the requirements. Strengths far outweigh any weaknesses. Risk of unsuccessful performance is very low." Id. at 53223. The solicitation made no mention of a minimum number of strengths needed to receive an Outstanding rating.

A reviewing court is limited in its review of an agency's award of technical ratings. "[T]echnical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess." E.W. Bliss Co., 77 F.3d at 449. "[W]here an agency's decisions are highly technical in nature . . . judicial restraint is appropriate and proper." Electro–Methods, Inc. v. United States, 7 Cl. Ct. 755, 762 (1985).

Nothing in the administrative record supports plaintiff's position that an offeror was entitled to an automatic Outstanding rating if it received eight strengths. Instead, both the solicitation and SSP support defendant's position that evaluators were permitted to use their judgment and make subjective decisions in evaluating proposals. This court declines to second guess the agency's technical evaluation.

Plaintiff has failed to show the agency treated it unequally when it rolled up its subfactor ratings into its Factor 3 (Management) rating.

3.       The Agency Did Not Conduct Misleading Discussions with AMG

Finally, plaintiff argues that the agency's downgrading AMG's Factor 3 rating from Outstanding to Good, was arbitrary, capricious, and contrary to law because AMG was purportedly not given adequate notice of the potential downgrade before it occurred. See Pl.'s Mot. 63-64.

Prior to AMG's submission of its fourth and final proposal, the agency provided AMG with a review of its third proposal, in which the agency rated AMG's Factor 3 as Outstanding, with both Subfactors 1 and 2 rated as Outstanding, and Subfactor 3 rated as Acceptable. See AR 87.1, at 53694. In its review of plaintiff's final proposal, the agency made no change to the ratings of the underlying subfactors, but nonetheless lowered the Factor 3 rating to Good. See Pl.'s Mot. 64; AR Tab 59, at 52341. Plaintiff complains that the agency held misleading discussions because if AMG had known that the agency planned to lower its rating to Good, AMG "could have raised its rating back to Outstanding by improving its submission with regard to Subfactor 3 (Small Business Contracting Plan)." Pl.'s Mot. 64.

As an initial matter, the court notes that it has already found that the rating for Factor 3 was rational. Thus the court turns to consider plaintiff's argument that the agency conducted misleading discussion.

31

The FAR dictates that after receipt of proposals, an agency must conduct exchanges with offerors to the following extents:

> [a]t a minimum, the contracting officer must . . . discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond.  The contracting officer also is encouraged to discuss other aspects of the offeror's proposal that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award.  However, the contracting officer is not required to discuss every area where the proposal could be improved.  The scope and extent of discussions are a matter of contracting officer judgment.

FAR 15.306(d)(3) (emphasis added).  Therefore, the contracting officer enjoys some measure of discretion in what is shared and discussed.

Plaintiff also points to Analytical & Research Technology, Inc. v. United States for the proposition that "[d]iscussions that mislead an offeror into 'responding in a manner that does not address the agency's concerns or that misinform[] the offeror concerning its proposal weaknesses or deficiencies" are improper.  See Pl.'s Mot. 64; Pl.'s Reply 20 (citing Analytical & Research Tech., Inc. v. United States, 39 Fed. Cl. 34, 48 (1997)).

However, defendant is correct that the agency had no concerns about either weaknesses or deficiencies that it did not address with AMG.  See Def.'s Reply 24.  Defendant's position is supported by a review of the SSEB Evaluation Report.  There were no weaknesses or deficiencies on any subfactor in Factor 3, and, thus, nothing the agency could have failed to disclose.  See AR Tab 59, at 52342-43.

Moreover, the agency provided plaintiff with an evaluation notice after review of its initial proposal, in which it specified those areas of plaintiff's Subfactor 3 (Small Business Subcontracting Plan) proposal that could be improved.  See Def.'s Reply 24 (citing AR Tab 67.2, at 52633).  Plaintiff received a Marginal rating on Subfactor 3 in its initial proposal, see AR Tab 67.1, at 52622, which it raised to an Acceptable rating in its final proposal, see AR Tab 59, at 52341.  Plaintiff thus had the information it needed to improve its proposal on Subfactor 3 well before the submission of its final proposal, but it managed to effect only modest improvement.

In any event, plaintiff fails to establish that it was prejudiced by the purported misleading discussions, as it is far too speculative to assume it would have been able to achieve a higher rating.

Analytical & Research Technology counsels that "[d]iscussions, when they are conducted, must be meaningful and must not prejudicially mislead offerors." Analytical & Research Tech., 39 Fed. Cl. at 48 (emphasis added).  To establish prejudice, the plaintiff must demonstrate that it had "a substantial chance" it would have received the contract award but for that error." Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1331 (Fed. Cir. 2004) (quotation marks omitted).

Plaintiff asserts it was prejudiced, because any change in its Subfactor 3 rating would have had some impact during the best value analysis, regardless of whether a higher rating on Subfactor 3 would have led to a higher rating on Capability overall.  See Pl.'s Mot. 64.  Plaintiff posits that it would have been able to raise its Subfactor 3 rating, which would have led to its receiving an Outstanding rating on Factor 3 (Management), which plaintiff speculates might have led the SSA to find, during his best value analysis, that GDOTS's proposal was not worth the price premium.  See Id.

Plaintiff asks too much of Subfactor 3.  AMG's view that it was prejudiced by misleading discussions is much too speculative and thus cannot support a finding that it would have had a substantial chance to receive the contract, but for the improper discussions.

The court is not persuaded, on this record, that the agency conducted prejudicially misleading discussions with plaintiff.

4.      Conclusion

Plaintiff has failed to show that the agency's evaluation of its proposal on Capability Factor 3 (Management) was arbitrary, capricious, contrary to law, or that the agency provided disparate treatment in the evaluation of Factor 3.

B.      The Agency's Evaluation of C4ISR Integration; Capability, Factor 1 (Production), Subfactor 1 (Production Approach) Was Rational

Plaintiff next complains that the agency had no basis for assigning a weakness, known as Weakness-25 (W-25), to its proposal for C4ISR[14] installation and integration.  See Pl.'s Mot. 41-42.  Plaintiff makes four arguments as to how the agency's assignment of W-25 resulted from unequal treatment, and was also unreasonable, arbitrary and

---

[14]      "'C4ISR' stands for Command, Control Computers, Communications, Intelligence, Surveillance and Reconnaissance.  The C4ISR kit is a combination of equipment, amplifiers, cabling, antennas, hardware and mounts that allow for the operation of a variety of different systems on the vehicle."  Def.'s Mot. 18 n.4.

capricious. See id. at 41. Plaintiff argues that the agency: (1) assigned it a weakness for its low estimate of the hours for installation, but assigned GDOTS a strength for an even lower number of hours; (2) evaluated AMG on factors outside the stated solicitation criteria; (3) assigned the weakness unreasonably given that the agency would bear no financial responsibility if AMG's labor costs proved higher than it estimated; and (4) conducted misleading discussions regarding its true concern about plaintiff's proposal. See id. at 41-50.

Defendant denies any unequal treatment. Defendant asserts that the agency awarded GDOTS a strength for its overall C4ISR integration plan, that the agency evaluated the offerors' proposals in accordance with the solicitation criteria, that the agency's valid concern was that plaintiff did not fully understand the task of C4ISR integration, and finally, that the agency repeatedly described the weakness in plaintiff's proposal. See Def.'s Mot. 18-23.

Defendant provided context for the importance of the C4ISR kit to the agency:

> the C4ISR kit was one of the most important—and expensive— systems for the GMV. Its cost accounted for approximately a third of the cost of each full-rate production vehicle. See AR Tab 47.4, at 49921. Given the importance of this system to the vehicle as a whole, it was important for the agency to ensure that the system worked properly. For this reason . . . the agency considered the entire integration effort in its evaluation, not just the work to install the C4ISR kit.

Def.'s Reply 7.

The court considers plaintiff's arguments in turn.

      1.     The Agency Did Not Treat Offerors Differently in Its Evaluation of C4ISR Installation and Integration

The parties differ in their view of the basis on which the agency awarded GDOTS a strength for its C4ISR proposal. Plaintiff posits that the agency awarded GDOTS a strength for the number of hours it proposed for C4ISR installation, see Pl.'s Mot. 42; defendant counters that a strength was awarded to GDOTS on the basis of its C4ISR integration plan, see Def.'s Mot. 19.

While plaintiff acknowledges that portions of the evaluation notices for both GDOTS and AMG addressed C4ISR integration, plaintiff contends that "AMG and GDOTS received unequal treatment regarding installation time." Pl.'s Reply 27. Plaintiff proposed [XXX] hours for C4ISR installation, and received a weakness for its

proposal, with the agency criticizing AMG for hours that were "much lower than expected."  Pl.'s Mot. 42 (citing AR Tab 59, at 52350).  GDOTS meanwhile proposed XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX, but received a strength for its proposal.  See id. (citing AR Tab 59, at 52234).

Defendant responds that according to the solicitation requirements, "the agency rated offerors on their approach to the entire integration process," not the installation efforts alone.  See Def.'s Mot. 19.  The integration process, explains defendant, is a "much broader project" than the mere installation of the kit into the vehicle, and the agency required offerors to "both account for the events leading up to the kit's installation . . . as well as events following that installation (such as testing of the kit to ensure that it worked)."  Id. (citing AR Tab 74.5, at 53202).

Review of the agency's evaluation of GDOTS shows it awarded GDOTS a strength for its understanding of the C4ISR integration requirements, not for the number of hours it proposed for C4ISR installation.  See AR Tab 59, at 52234.  In the agency's initial evaluation of GDOTS, it assigned GDOTS a weakness for C4ISR integration, as it found the XXXXXXXXXXXXXXXXXXXXXXXXXXXXX, and the proposal failed to provide sufficient information to demonstrate how XXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.  Id. at 52236.  In closing, the agency told GDOTS, "[t]he proposal fails to demonstrate a clear methodology of the C4ISR integration process which contributes a risk to C4ISR performance, integration, and delivery."  Id.

GDOTS significantly improved its second proposal.  The agency found the earlier weakness had been resolved and awarded GDOTS a strength, as detailed below:

> GDOTS' [second proposal] demonstrated an outstanding approach to addressing W-4 (C4ISR A-kit installation time), by detailing the level of effort, down to the minute, that is occurring during the XXXXX that have been allocated for C4ISR A-kit installation . . . . The new detail significantly reduces the expected risk associated with C4ISR A-kit installation.  Additionally, GDOTS' [second proposal] provides new detail regarding the C4ISR A-kit subsystem assembly that is occurring at GDC4S . . . This information explains that a XXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXX.  The XXXXX is the time that GDLS requires to install the C4ISR A-kit.  GDOTS has an exceptional understanding of the C4ISR integration requirements.

Id. at 52234 (emphasis added).

35

Plaintiff, by contrast, did not manage to improve its proposal, and received either a significant weakness (for the second proposal) or a weakness (for the first, third and fourth proposals) for C4ISR kit integration.  See id. at 52345, 52348-50.  In its fourth and final proposal, plaintiff was unable still to resolve its weakness.

> However, AMG has now provided additional detail regarding the C4ISR integration effort; the Government still believes the total proposed labor hours are insufficient.  Although [XXX] hours of elapsed time may be sufficient from a TPCP standpoint for the production line, other factors must be considered when evaluating this schedule such as man hours (i.e., number of bodies employed on the effort) and methodology (e.g., use of pre-fabrication methods, complexity of C4ISR integration effort, production methods, etc.).  Based on Government estimates and similar FOSOV C4ISR integration efforts, [XXX] direct man hours and [XXX] indirect man hours proposed per vehicle is much lower than expected.

Id. at 52350 (emphasis added).

On review of the record, the court finds that the agency did not award GDOTS a strength for the number of hours it proposed for C4ISR installation.

Plaintiff also points to the last sentence of its the evaluation notice—[b]ased on Government estimates and similar FOSOV C4ISR integration efforts— and claims that the agency failed to hold GDOTS to this standard, as its evaluations included no such reference.  See Pl.'s Mot. 44 (citing AR Tab 59, at 52350).

Defendant points out that it was unnecessary to include such a statement in the evaluation of GDOTS's second proposal (its final evaluation of C4ISR integration), because the agency no longer had a concern about the number of GDOTS's proposed labor hours.  See Def.'s Reply 9 (citing AR Tab 59, at 52234).  Defendant disputes the charge of unequal treatment, and defends that evaluators may use their own experience with similar types of efforts when analyzing proposals.  See Def.'s Mot. 21.

The court finds the agency did not hold AMG to a different standard than GDOTS in its evaluation of its proposal for C4ISR integration.

### 2.    The Agency Used Evaluation Criteria Stated in the Solicitation

Plaintiff next asserts that the agency based W-25 on factors outside of those stated in the solicitation.  The solicitation authorized agency review of an offeror's Time Phased Critical Path (TPCP) to ensure that the offeror could meet the production schedule.  See

Pl.'s Mot. 45-46.  The evaluators explained their concerns about plaintiff's time estimates as follows:

> Although [XXX] hours of elapsed time may be sufficient from a TPCP standpoint for the production line, other factors must be considered when evaluating this schedule such as man hours (i.e., number of bodies employed on the effort) <u>and methodology</u> (e.g., use of pre-fabrication methods, complexity of C4ISR integration effort, production methods, etc.).

AR Tab 59, at 52350 (emphasis added).

Plaintiff attempts to draw a distinction between the solicitation's requirement of C4ISR integration and the agency's interest in "methodology."  Pl.'s Mot. at 47 (citing AR Tab 59, at 52350).  Defining the term "integration" to mean "how to make something a part of a larger thing," plaintiff argues that this definition does not contemplate methodology, and thus such consideration is beyond the scope of the solicitation criteria. <u>Id.</u>

Plaintiff points to nothing in the solicitation that supports its narrow interpretation of C4ISR integration.  And its proposed interpretation is at odds with the agency's evaluation of plaintiff's initial proposal, in which the agency found "[t]he proposal fails to demonstrate a <u>clear methodology</u> of the C4ISR integration process which contributes a risk to C4ISR performance, integration, and delivery."  AR Tab 59, at 52348 (emphasis added).  In its evaluation of plaintiff's second proposal, the agency again found fault with plaintiff's methodology: "The proposal is incomplete and fails to demonstrate a <u>clear methodology</u> and excludes important details of the C4ISR integration process which represents a high risk to C4ISR performance, integration, and delivery."  <u>Id.</u> at 52345 (emphasis added).

Plaintiff's effort to interpret a word in its final evaluation in such a way to suggest the agency evaluated more than what was set forth in the solicitation evaluation criteria is unavailing.  The court finds that the agency's evaluation of AMG was based on evaluation criteria stated in the solicitation.

### 3.   The Agency's Evaluation Did Not Consider Financial Risk of AMG's Low Labor Estimates

Plaintiff argues that the agency unreasonably assessed AMG a weakness for AMG's labor estimate.  Plaintiff observes that even if AMG's labor estimate for the C4ISR integration was low, the agency would have had no responsibility for any additional labor costs.  <u>See</u> Pl.'s Mot. 48.  Plaintiff explained that "this work falls under

the fixed-price portion of the work," thus the burden for any cost overruns would fall on plaintiff, not the agency.  Id.

Defendant responds that the agency's evaluations went beyond assessing financial risk to the agency.  Defendant explained that the "risk that the agency was evaluating in the technical evaluation was the risk that AMG could not deliver a <u>successful technical solution</u>." Def.'s Mot. 23.  The risk the agency identified was AMG's apparent failure "to understand the complexity of the work required to integrate the C4ISR kit."  Id.

The agency's evaluation of plaintiff's sequential proposals reflects the agency's concern about plaintiff's ability to deliver vehicles on time.  In its evaluation of plaintiff's second proposal, the agency said, "[t]he proposal fails to demonstrate a clear methodology of the C4ISR integration process which contributes a risk to C4ISR performance, integration, and delivery." AR Tab 59, at 52348 (emphasis added).

The court finds plaintiff's argument to be unpersuasive.

4.      The Agency Did Not Conduct Misleading Discussions with AMG

Plaintiff asserts that the agency failed to conduct meaningful discussions, as required by FAR 15.306.  See Pl.'s Mot. 48-50.  Plaintiff claims that the agency failed to inform AMG of the agency's concerns beyond the number of installation hours.  Plaintiff complained that the agency's reference to "other factors" in its final evaluation represented a new concern.  See id. at 49.

Defendant responds that the agency repeatedly informed plaintiff of its concerns. See Def.'s Mot. 21-22.

The FAR dictates that after receipt of proposals, an agency must conduct exchanges with offerors, and

> [a]t a minimum, the contracting officer must . . . discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond. The contracting officer also is encouraged to discuss other aspects of the offeror's proposal that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award. However, the contracting officer is not required to discuss every area where the proposal could be improved. The scope and extent of discussions are a matter of contracting officer judgment.

FAR 15.306(d)(3) (emphasis added).

The agency identified a significant weakness in AMG's second proposal.  See AR Tab 59, at 52345.  That was the only proposal for which the agency was obligated to provide plaintiff with discussion.  The second evaluation notice to AMG was lengthy, detailed and pointed.  In relevant part, the agency said:

> [t]he Government views this as highly risky considering this lack of detail. The proposal is incomplete and fails to demonstrate a clear methodology and excludes important details of the C4ISR integration process which represents a high risk to C4ISR performance, integration, and delivery. . . . The Government requests additional detail regarding the C4ISR A-kit integration and testing efforts for LRIP and FRP vehicles.  This effort is expected to include A-kit testing (including CFE and GFE, pre- and post-installation where appropriate), material fabrication/kitting as appropriate, material installation for all kits, QA of installation, and Final Inspection Record (FIR) and associated man hours.

Id.

Recent case law interpreting  FAR 15.306(d)(3) suggests that the contracting officer should give an offeror at least one meaningful opportunity to respond to a significant weakness.  "'The substance of the requirement is that the protestor should be given at least one meaningful opportunity to respond to significant weaknesses.'" Sentrillion Corp. v. United States, 114 Fed. Cl. 557, 570 (2014) (quoting Orca Nw. Real Estate Servs. v. United States, 65 Fed. Cl. 1, 9 (2005).  However, an agency has no obligation

> to continually discuss a proposal's shortcoming until the offeror hits on the revision that responds to the agency's concerns—initial notice is sufficient. The substance of the requirement is that the protestor should be given at least one meaningful opportunity to respond to significant weaknesses.

Orca Nw. Real Estate, 65 Fed. Cl. at 9 (internal citation omitted).

Plaintiff can find no support in either FAR 15.306(d)(3) or the interpreting case law for its complaint.  On this record, the court cannot find that the agency failed to communicate its concern to AMG about AMG's proposal for C4ISR integration.  Nor can the court find that the agency conducted misleading discussions with AMG regarding its C4ISR integration.

5.      Conclusion

Plaintiff has failed to show that the agency's assessment of Weakness-25 for Capability Factor 1 (Production), Subfactor 1 (Production Approach) resulted from unequal treatment, or was unreasonable, arbitrary and capricious.

C. The Agency's Evaluation of Capability, Factor 2 (Technical)

AMG challenged the agency's evaluation of its Factor 2 evaluation on five separate points: Gross Vehicle Weight Rating, Antilock Braking System, Air Transportability, Armor Kit Tools, and Human Factor Engineering.  See Pl.'s Mot.  50-63.

The court considers each challenge in turn.

1.      The Agency's Evaluation of  Gross Vehicle Weight Rating; Capability, Factor 2 (Technical), Subfactor 1 (Vehicle Performance) Was Rational

Plaintiff asserts that the agency's evaluation was arbitrary, capricious and provided unequal treatment of offerors, in violation of FAR 15.306(e)(1).  See Pl.'s Mot. 51-52.  Plaintiff specifically complains that the agency engaged in unequal treatment of offerors when it awarded GDOTS a strength for a performance criteria, Gross Vehicle Weight Rating (GVWR)[15], yet awarded AMG no strength despite, as plaintiff claims, AMG's superior proposal.  See id. at 51.

Defendant responds that the agency correctly evaluated both offerors and that GDOTS earned a strength based on the superior proposal it presented.  See Def.'s Mot. 23-26.  AMG provided only an adequate proposal, which did not merit a strength.  See id. at 25.

---

[15]     According to defendant, Gross Vehicle Weight Rating (GVWR) is "the total weight that the vehicle's load-bearing structures could carry."  Def.'s Reply 13.  Load bearing structures include, for example, "tires, wheels, axles, suspension frame."  AR Tab 29.4, at 5497.  So, the higher the GVWR the better, as this represented more weight the vehicle could bear.

a.   The Position of the Parties Regarding the Agency's
Evaluation of the Offerors' Gross Vehicle Weight Rating

Plaintiff makes two arguments about the basis for the agency's award of a strength to GDOTS for its vehicle's GVWR.  First, plaintiff assumes the agency awarded GDOTS a strength for simply exceeding the minimum GVWR, and argues that AMG should have received a strength as well, because it also exceeded the minimum GVWR by a greater number of pounds than did GDOTS.  See Pl.'s Mot. 51.

Second, plaintiff complains that the agency awarded GDOTS a strength because of the significant difference between its vehicle's GVWR and its Gross Vehicle Weight[16] (GVW), see id. at 51-52, with the difference being the amount of additional payload the vehicle could carry.  Plaintiff complains that such a determination went beyond the stated solicitation evaluation criteria.  See Id. at 52.  Plaintiff asserts the agency should not have awarded GDOTS a strength on this evaluation, without also awarding AMG a strength. See id.

Defendant responds that the agency did not award any offeror a strength merely for exceeding the minimum GVWR.  See Def.'s Mot.  24.  Rather, the agency awarded GDOTS a strength for providing a vehicle with a significant difference between its GVWR and GVW, which in this case, was [XXX] pounds.  See id.

b.   The Agency Did Not Award GDOTS a Strength Merely for
Exceeding the Minimum GVWR

As provided in the solicitation, "[t]he proposed vehicle Gross Vehicle Weight Rating (GVWR) shall be evaluated to determine the risk of meeting a GVWR of greater than 13,000 lbs."  AR Tab 74.5, at 53227 § M.3.2.2a.

As explained by the SSEB, a strength "is an aspect of an offeror's proposal that has merit or exceeds specified performance or capability requirements in a way that will be advantageous to the Government during contract performance."  AR Tab 59, at 52129. As defendant emphasized, GDOTS provided a vehicle that could carry [XXX] pounds of additional payload, a technical capability that demonstrated to the agency a clear understanding by the offeror of the need to adapt to different mission requirements.  See Def.'s Mot.  24.

---

[16]   Gross Vehicle Weight (GVW) included the vehicle, payload of the vehicle, crew, and various equipment.  See AR Tab 29.4, at 5497.

Review of the agency's evaluation of GDOTS's final proposal shows—unmistakably—that the agency did not award GDOTS a strength merely for exceeding the minimum GVWR.  As the agency said,

> GDOTS' proposal demonstrates a superior understanding to more than meeting the threshold GVWR requirement of greater than 13,000 lbs. with a proposed GVWR of [XXX] lbs., <u>which is [XXX] lbs. more than the proposed Gross Vehicle Weight (GVW) of [XXX] lbs. and provides a clear understanding of the need for the additional mission configurations to accommodate configuration kits in addition to current high priority configuration at GVW</u>.  Additional weight bearing capability exceeds the weight of any one kit including armor that may need to be added to the vehicle in order to meet specific mission requirements, and allows for future vehicle weight growth.

AR Tab 59, at 52248 (emphasis added).

Relying on the fact that each offeror provided a vehicle exceeding the minimum GVWR, plaintiff argues that the agency treated the offerors unequally when it awarded GDOTS a strength, but failed to award AMG a strength.  Plaintiff's assertion cannot stand on this record.

The court finds that the agency did not award GDOTS a strength for its Gross Vehicle Weight Rating merely on the basis that it exceeded the minimum GVWR.  The strength was based on the difference between GDOTS's proposed GVW and GVWR, which would allow for superior weight bearing capability.  The court now considers whether the basis on which the agency awarded GDOTS a strength was outside of the stated solicitation evaluation criteria.

            c.      The Agency's GVWR Evaluation Was Within the Solicitation
                    Evaluation Criteria

Plaintiff contends that defendant's explanation for the agency's award of a strength to GDOTS, on the basis of the additional [XXX] pounds the vehicle could carry, was "moving the goalposts."  <u>See</u> Pl.'s Reply 33.  Plaintiff argues that because the solicitation did not expressly state that the agency would consider how much additional weight the vehicle could carry, that is, the difference between GVWR and GVW, the agency was not permitted to evaluate offerrors on this point and thus, should not have awarded GDOTS a strength for it.  <u>See id.</u> at 33-34.

Plaintiff relies on <u>Norsat International</u> for the proposition that an agency may not award a strength for criteria that are not included in the solicitation.  <u>See</u> Pl.'s Reply 33

(citing Norsat Int'l [Am.], Inc. v. United States, 111 Fed. Cl. 483,499 (2013)).  But, plaintiff's reliance on Norsat International is misplaced.  The court in Norsat International found that the agency had improperly awarded an offeror a strength for "an item it proposed for the future but was not part of its current proposal."  Norsat Int'l, 111 Fed. Cl. at 499.  The concern addressed in that case is not present here.  In this case, GDOTS proposed only what it intended to provide in its current proposal.

Defendant drew the court's attention to more apposite authority, stating that "a solicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors."  Def.'s Reply 14 (quoting Banknote Corp. of Am. v. United States, 56 Fed. Cl. 377, 387 (2003), aff'd, 365 F.3d 1345 (Fed. Cir. 2004)).

The agency defined the vehicle Mission for the offerors:

The GMV will be a standardized Special Operations combat vehicle with the operational flexibility to support the Special Operations Forces core activities of Direct Action . . ., Special Reconnaissance . . ., Unconventional Warfare . . ., Counterterrorism . . ., Security Force Assistance . . .  and Counterinsurgency . . . Operations.  In order to perform these multiple missions, it is required that all GMV be reconfigurable to meet all mission requirements.

AR Tab 32, at 5825.

The GVWR was the stated factor for the agency's evaluation—that is, the agency needed to know whether the proposed vehicle's support systems could carry at least 13,000 pounds.  The agency seeks to procure a vehicle upon which the military will depend to perform in a variety of situations.  The more pounds that could be devoted to additional payload, as opposed to the GVW itself, the better.  Quite simply, the more the vehicle can carry, the more it can do, and the more it can do, the better for the agency.

The court finds that a determination of the difference between the vehicle's gross vehicle weight rating and its gross vehicle weight, that is, the amount of weight available for additional payload, is an intrinsic consideration when evaluating a vehicle's gross vehicle weight rating.

d.    Conclusion

Plaintiff has failed to show that the agency's evaluation of its gross vehicle weight rating was arbitrary or capricious.  Plaintiff also has failed to show that the agency treated the offerors unequally, and thus, there is no violation of FAR 15.306(e)(1).  In addition,

plaintiff has failed to show that the agency's evaluation of the offerors' gross vehicle weight rating were outside of the solicitation evaluation criteria.

> 2.    The Agency's Evaluation of Anti-lock Brake System: Capability, Factor 2 (Technical), Subfactor 1 (Vehicle Performance) Was Rational

Plaintiff asserts that the agency's evaluation of its anti-lock brake system (ABS) was arbitrary and capricious and deviated from the solicitation's evaluation criteria.  Pl.'s Mot. 52.  The agency assessed a weakness because plaintiff's proposal "failed to describe how the 'off-road surfaces' calibrations [it provided] correlate[d] to the cross country mission profile" of the vehicle.  AR Tab 59, at 52366.  Plaintiff asserts that its vehicle complied with the solicitation criteria, as (1) it included an anti-lock brake system, and (2) the solicitation evaluation criteria did not require the testing the agency specified in the weakness.  See Pl.'s Mot. 52-54.

Defendant responds that the solicitation required both that the vehicle have an anti-lock brake system, and that offerors "demonstrate that those configurations would actually work."  Def.'s Mot. 26.  It was the absence of data in AMG's proposal showing that its proposed anti-lock brake system "would function over the defined terrain . . . that led the evaluation team to assign AMG a weakness on its anti-lock brake design."  Def.'s Reply 17.

Review of the record shows that notwithstanding AMG's assertion during this protest that it was not required to provide testing to demonstrate how its anti-lock brakes performed on terrain according to the vehicle's mission profile, AMG understood that the agency wanted this data and thus made, at least, a facial attempt to provide it.  See Pl.'s Reply 35-37.  AMG says that in its final proposal it "submitted [an] "AMG Slip Control Off Road Calibration Report 2013" and informed [the agency] that this test report "describes ABS performance over cross country terrain.  This report also provides sufficient information to demonstrate braking over the complete [vehicle] Mission profile."  Id. (citing AR Tab 46.2, at 43475, 43503, 43631, 44273-74).  Further review of AMG's final proposal shows that in describing its off-road calibration efforts, AMG took the position that "[t]he mission profile of vehicles receiving this ABS includes more demanding off-road surfaces that require unique solutions to ensure satisfactory performance."  AR Tab 46.2, at 44273.  It is apparent that in its final proposal, AMG clearly was focused on providing data consistent with the vehicle's mission profile.

Defendant explains that the problem with AMG's proposal was that "nowhere [did] AMG define the specific mix of surfaces that comprised [the] 'cross country terrain,' nor [did] AMG provide other data to correlate that terrain to the actual mix of environments defined in the [vehicle] mission profile."  Def.'s Reply 17.  Defendant

reviews the cited pages of AMG's final proposal and states that none "provides a technical description about the surfaces that AMG used," nor did AMG "describe the terrain mixes." Id. (citing AR Tab 46.2, at 43475, 43503, 43631, 44273-74).

Review of the cited pages in AMG's final proposal shows that defendant is correct. Beyond the conclusory labels—off-road and cross country terrain—AMG provided no indication of the type of terrain over which it conducted tests on its anti-lock braking system.

Nevertheless, the claim plaintiff makes now is that under the solicitation criteria, it was not required to provide test results for cross country terrain. If plaintiff's claim is correct, the fact that it tried, but failed, to provide this information would be immaterial. Accordingly, the court considers whether the solicitation evaluation criteria required an offeror to demonstrate the ability of its anti-lock braking system to perform over cross country terrain.

> a.   The Solicitation's Evaluation Criteria Required that Offerors Demonstrate ABS Requirements

AMG argues that no "provision in the RFP require[s] offerors to submit data regarding how their proposed antilock brake systems ("ABS") performed over terrain specifically matching the [vehicle's] 'mission profile.'" Pl.'s Reply 34. Rather, plaintiff argues, it had only to comply with the requirements of PSpec 3.4.23, which was silent regarding testing on cross country terrain. See Pl.'s Mot. 52.

Defendant points out that the solicitation includes additional provisions with which an offeror must comply. When such provisions are taken together with PSpec 3.4.23, the solicitation requires an offeror to submit data demonstrating how its proposed systems functioned over the defined terrain. See Def.'s Mot. 26-27; Def.'s Reply 16-17.

PSpec 3.4.23 provides that "[t]he vehicle shall have service brakes, parking brakes, emergency brakes, and anti-lock brakes." AR Tab 29.3, at 4250. The requirements for PSpec 3 (of which subsection PSpec 3.4.23 is a part) included that "[t]he systems, in any configuration, shall be capable of operating on primary and secondary roads, off-road, on trails, and shall meet all mobility parameters of this specification and all prescribed environments." Id. at 4242.

Defendant asserts that the solicitation informed offerors that in evaluating the vehicle performance subfactor, the agency would require offerors to demonstrate that their vehicle configurations worked. See Def.'s Mot. 26 (citing AR Tab 74.5, at 53221, 53231).

> The proposal will be evaluated to determine the extent to which the "Top 5 Key Performance Requirements" meet or exceed threshold and objective requirements.  The proposal will be evaluated to determine the extent to which it demonstrates the Offeror's technical ability and approach to any non-compliant "Top 5 Key Performance Requirements," and has a suitable solution supported by explicit details and analysis with minimal risk and impact on program performance, cost, and schedule elements.

AR Tab 74.5, at 53231.  Braking was included in the Top 5 Key Performance Requirements.  See id. at 53228 § M.3.2.2b.

And finally, in Annex E to the Performance Specification, the solicitation provided guidance on mission terrain profile.  See AR Tab 29.4, at 5426-30.  The mission profile provided detailed descriptions of the terrain over which the vehicle was expected to travel, including primary roads, secondary roads, trails and cross-country surfaces, notably, the same surfaces listed in PSpec 3.  See id. at 5429 § 1.2.2.  The agency estimated that 70% of travel would be on unimproved surfaces (30% over trails and 40% over cross-country), and 30% over improved surfaces (primary and secondary roads).  See id.

Cross-country terrain, the type of terrain over which it was estimated the vehicle most often would travel, was defined as not being subject to repeated traffic, and possibly consisting of "tank trails with crushed rock or having large exposed obstacles (rocks, boulders, etc.), but there are no roads, routes, well-worn trails, or man-made improvements.  Id.  This includes, but is not limited to, flat desert, marshes, vegetated plains, jungle, dense forest, mountains, and urban rubble."  Id.

A court "must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions."  Banknote, 365 F.3d at 1353; see also NVT Techs., 370 F.3d at 1159 ("An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous.").  And reviewing courts give the greatest deference possible to determinations on technical matters, in recognition of the special expertise of procurement officials. See E.W. Bliss Co., 77 F.3d at 449; J.C.N. Constr., 107 Fed. Cl. at 509-510; Beta Analytics Int'l, 67 Fed. Cl. at 395.

Despite plaintiff's attempt to portray PSpec 3.4.23 as something akin to an isolated, self-standing requirement, the solicitation simply cannot be read in such manner. The requirements for PSpec 3 clearly apply to PSpec 3.4.23, and thus, provide that the anti-lock braking system must "be capable of operating on primary and secondary roads, off-road, [and] on trails."  AR Tab 29.3, at 4242.  Annex E to the Performance Specification provides a specific description of these types of terrain.  As might be

expected, the solicitation provides that offerors must demonstrate compliance with requirements.  See AR Tab 74.5, at 53231.

Consideration of the solicitation as a whole compels the court to find that the agency's requirement that AMG demonstrate the ability of its anti-lock braking system to perform over cross country terrain was not outside of the stated solicitation criteria.

b.    The Agency's Evaluation Notices Regarding Mission Profile Testing

AMG also complains that the agency's evaluation represented "goalpost-moving," with the agency telling AMG, only after it submitted its fourth and final proposal, that it "wanted something different—proof of testing over the specific GMV 1.1 mission profile."  Pl.'s Reply 37.  AMG suggests that this notice was the first it had heard of the mission profile standard.  But review of the evaluation notices the agency issued AMG yields evidence to the contrary.

The agency assessed AMG with either a significant weakness or weakness for its anti-locking brake system on each of its four proposals.  AMG received a significant weakness on its initial proposal, see AR Tab 59, at 52361-62, which was mitigated to a weakness after its second proposal, see id. at 52365.  This weakness, W-18, remained unresolved throughout the process of evaluating AMG's third and fourth proposals.  See id. at 52366.

In its evaluation of the second proposal in particular, the agency noted that "AMG provided insufficient details of the ABS functionality in order to determine impact to vehicle off-road performance which accounts for a majority of the GMV 1.1 Mission Profile."  Id. at 52365.  The agency expressly questioned AMG about "[w]hat additional specific details does AMG have on the integration and functionality of the proposed ABS onto GMV 1.1 over the vehicle[']s mission profile with special emphasis on any testing and/or modeling and simulation to validate this solution and any associated cost and schedule impacts?"  Id. at 52366.

In its third proposal, AMG provided test results including the performance of the ABS over several types of terrain not included in the mission profile, while failing to provide test results for performance over cross country terrain, which the agency said "makes up a considerable percentage of the GMV 1.1 mission profile."  Id.  The agency found that Weakness-18 remained, as AMG had "failed to provide sufficient information to demonstrate an adequate approach to braking over the complete GMV 1.1 Mission Profile."  Id.

The evaluation notices show that the agency repeatedly told AMG that it needed to demonstrate performance on the mission profile terrain, well before the final proposal.

### c.     Conclusion

Plaintiff has failed to show that the agency's evaluation of its anti-lock brake system (ABS) was unreasonable, arbitrary or capricious, or deviated from the solicitation's evaluation criteria.

### 3.     The Agency's Evaluation of Air Transportability Requirement; Capability, Factor 2 (Technical), Subfactor 1 (Vehicle Performance) Was in Error

Plaintiff asserts the agency acted arbitrarily and capriciously and deviated from the solicitation's evaluation scheme, when it assessed AMG a weakness for failing to meet a configuration requirement for Internal Air Transportability (IAT) in a cargo helicopter. See Pl.'s Mot. 56.  In its final evaluation, the agency said AMG failed to meet the requirement that wheel weight[17] not exceed 2500 pounds.  See AR Tab 59, at 52369-70. AMG contends that this requirement is inconsistent with the solicitation evaluation criteria, and that in any event, its proposal met the requirement.  See Pl.'s Mot. 56.

Defendant responds that the wheel weight requirement was included in the solicitation, as supplemented by a clarification letter.  See Def.'s Mot. 28-29.  Defendant also challenges plaintiff's claim that AMG's vehicle actually met the requirement.  See Def.'s Mot. 29.

The dispute between the parties concerning the weakness assessed against AMG on this subfactor centers on the impact the clarification letter the agency issued in February 2013 had on the agency's Internal Air Transportability requirements.

### a.     Solicitation Evaluation Criteria

The solicitation provided that the agency would evaluate each offeror under the Vehicle Performance Subfactor on what the agency termed the "Top 5 Key Performance Requirements" (KPRs).  AR Tab 74.5, at 53227 § M.3.2.2.  The agency told offerors that it would evaluate offerors under this subfactor on only the KPRs.  See AR Tab 30, at 5600 (Q1).  Plaintiff contends that offerors were permitted to tradeoff such compliance

---

[17]     Wheel weight is the weight of the vehicle, including equipment and personnel, divided by the number of wheels.  See Def. Mot. 28.

with alternate performance specifications that were not KPRs to "meet other objectives without penalty." Pl.'s Mot. 57.

The KPRs included Transportability. This performance requirement included the government's evaluation of whether the proposed vehicle would be internally air transportable in a helicopter, according to PSpec 3.4.39a. See AR Tab 74.5, at 53227 § M.3.2.2a.

PSpec 3.4.39a states: "[t]he [vehicle] at [Critical Flight Vehicle Weight (CFVW)] shall be internally air transportable (IAT) by [helicopter] in accordance with MIL STD 1366." AR Tab 29.3, at 4254. MIL-STD-1366 was the Department of Defense Interface Standard for Transportability Criteria. See id. at 4170-71. The solicitation stated that compliance with this performance standard was mandatory. See id.

In the subsection listing "Internally Transportable" specifications, in addition to PSpec 3.4.39a, there were two other performance specifications, PSpec 3.4.39b-c. Id. at 4254. PSpec 3.4.39b required that the vehicle be internally transportable for a 100 nautical mile radius, id., and is not at issue here. PSpec 3.4.39c required that the vehicle "wheel weight shall not exceed 2,500 lbs at CFVW." Id.

The agency sent offerors, including AMG, a post-discussion letter on February 1, 2013. See AR Tab 68.2, at 52650. The agency told offerors, "[t]his letter serves as notice for general clarification," for submission of the offerors' second proposal, required by February 19, 2013. Id. The agency provided several clarifications, one of which was for internal transportability:

> The Government provides the following clarification on axle loading for Internal Air Transportable in the [helicopter]:
>
> The requirement for wheeled vehicles loaded internally and positioned on the [helicopter] treadway is to be positioned on the treadway with a max uniformly distributed load over limited area of [one] square foot or max load per wheel of 2500 lbs.

Id. at 52651 (formatting omitted) (emphasis added).

b.    The Wheel Weight Requirement is Part of PSpec 3.4.39c, Not PSpec 3.4.39a

The issue presented by the parties is how to read the February 2013 letter in conjuction with PSpec 3.4.39a and PSpec 3.4.39c. It is noted that although defendant asserts the February 2013 letter supplemented the evaluation criteria, see Def.'s Mot. 28,

the February 2013 letter expressly states the agency is providing a clarification; the letter says nothing of supplemented evaluation criteria, see AR Tab 68.2, at 52651.

To be clear, the issue is not whether the agency may impose a wheel weight requirement on offerors. It may, and it did. The issue is whether the wheel weight requirement the agency imposed in its clarification is properly read as part of PSpec 3.4.39a or PSpec 3.4.39c.

This is a matter of solicitation interpretation which is a question of law for the court. See Banknote Corp. of Am., 365 F.3d at 1353; see also Contract Servs., 104 Fed. Cl. at 274. "The principles governing interpretation of Government contracts apply with equal force to the interpretation of solicitations issued by the Government for such contracts." Banknote, 365 F.3d at 1353 n.4. A court must "consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions." Banknote, 365 F.3d at 1353; see also NVT Techs., 370 F.3d at 1159 ("An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous.").

Plaintiff argues that review of the performance specifications shows that the agency included the wheel weight requirement in only PSpec 3.4.39c. See Pl.'s Mot. 56-57. Plaintiff argues that "by setting forth the 2,500 lbs./wheel standard in a stand-alone PSpec provision (3.4.39.c), and conspicuously omitting that provision from the list of 'Top 5 Key Performance Requirements,' the agency clearly conveyed that compliance with the 2500 pounds per wheel standard was not to be evaluated." Id. at 57-58.

Defendant responds that the February 2013 letter provided a supplemental requirement that "made clear what its requirements for air transportability would be." Def.'s Mot. 29. Defendant offered further explanation in its reply, explaining that MIL-STD-1366, expressly incorporated into PSpec 3.4.39a, "requires that vehicles have load of 2,500 pounds per square foot," which some offerors found inconsistent with an axle-loading requirement provided elsewhere in the solicitation. Def.'s Reply 19. Defendant does not explain what it meant by an "axle loading" requirement, and the court is unable to discern whether this is a reference to PSpec 3.4.39c. In any event, defendant asserts the February 2013 letter clarified an ambiguous requirement. Id.

In its argument, defendant focuses on the general point that the February 2013 letter clarified the wheel weight requirement, without addressing the specific point of why the better reading of the solicitation is that the February 2013 letter supplemented PSpec 3.4.39a, rather than eliminated an ambiguous provision in PSpec 3.4.39a (as incorporated through MIL-STD-1366) and thus left PSpec 3.4.39c as it first appeared.

The February 2013 letter did clarify the agency's "air transportability" requirements, but the letter made no reference to any performance specification. Nor did the letter reference any change, or supplementation, of the Top 5 KPRs. The solicitation itself included three separate performance specifications addressing "Internally Transportable" requirements, PSpecs 3.4.39a-c, yet only the first was a KPR. See AR Tab 29.3, at 4254; Tab 74.5, at 53227. Defendant's simple assertion that the February 2013 letter supplemented air transportability requirements is insufficient to show that it supplemented PSpec 3.4.39a.

Defendant's interpretation of the solicitation evaluation criteria does not persuade the court. The plain text of the solicitation provides that the wheel weight requirement is part of PSpec 3.4.39c. Defendant's explanation that the February 2013 letter clarified the ambiguous provision in MIL-STD-1366—requiring vehicles to have load of 2,500 pounds per square foot—can be interpreted reasonably as the agency's elimination of this requirement, in favor of the wheel weight requirement already set forth in the solicitation at PSpec 3.4.39c.

Defendant's interpretation of PSpec 3.4.39a and PSpec 3.4.39c would render the latter performance specification useless and superfluous. The only requirement in PSpec 3.4.39c is that "wheel weight shall not exceed 2,500 lbs at CFVW." If this requirement was now read into PSpec 3.4.39a, then PSpec 3.4.39c serves no purpose.

c.    Conclusion

The court finds that the requirement that wheel weight not exceed 2,500 pounds was included in PSpec 3.4.39c, not PSpec 3.4.39a. The Top 5 Key Performance Requirements for this vehicle performance subfactor do not include PSpec 3.4.39c. As the agency committed that it would not evaluate offerors on requirements outside the Top 5 Key Performance Requirements, the agency's evaluation of plaintiff on the wheel weight requirement was outside of the stated solicitation evaluation criteria. Thus, it is unnecessary to reach plaintiff's alternative argument that it actually complied with the requirement.

The court finds the agency was in error in assigning plaintiff Weakness-27 for Capability, Factor 2 (Technical), Subfactor 1 (Vehicle Performance).

4.      The Agency's Evaluation of Armor Kit Tools: Capability, Factor 2
(Technical), Subfactor 2 (Systems Integration/Engineering) Was
Rational

Plaintiff asserts that the agency's evaluation of its Armor Kit Tools was arbitrary, capricious and deviated from the solicitation's evaluation criteria.[18] Pl.'s Mot. 58-60. The agency assessed a weakness because AMG did not "specify the weight and 'space claim' (i.e. size) of the tools necessary to allow in-field removal of the 'B-kit' armor." Id. 58-59 (citing AR Tab 112.4, at 54122). AMG characterizes this as a trivial issue, not deserving of a weakness. See id. 59.

Defendant responds that AMG simply failed to provide the information the agency needed to "determine whether AMG's proposal increased the risk of the proposed solution," and thus assessed a weakness. Def.'s Mot. 33.

The agency defended that it conducted its evaluation in accordance with § M.3.2.2.2.b of the solicitation, see AR Tab 59, at 52372, which directs that its assessment would include the following elements:

[t]he Government shall evaluate armor mounting procedures, ease of installation, tooling required to integrate armor, and time and expertise required to integrate armor. The proposal will be evaluated to determine the extent to which the proposal demonstrates the Offeror[']s technical ability and approach to integrating the weapons . . . .

AR Tab 74.5, 53231 § M.3.2.2.2.b (emphasis added).

The agency issued AMG evaluation notices on this weakness, W-22, for its last three proposals. See AR Tab 59, at 52372-73. (AMG's initial proposal received a significant weakness. See id. at 52371.) In evaluating AMG's second proposal, the agency directed AMG to: "[P]rovide specific details to validate the armor kit installation claim. This should include the expertise/number of operators, time, the tools and equipment required to install the armor kit and which of these tools and equipment are included in the vehicle BII." Id. at 52373 (emphasis added). In its evaluation of AMG's third proposal, the agency found that "the proposal indicates that the General Mechanics Tool Kit (GMTK) is not part of the proposed vehicle BII, as required to install the armor B-kit. AMG fails to demonstrate an adequate approach to meeting the PSpec requirement for installing and removing kits with the vehicle BII, which attributes additional field performance risk to the program." Id. at 52373 (emphasis added).

--------

[18]    Both parties limited their argument on this point to their opening briefs. See Pl.'s Reply 44 n.17; Def.'s Reply 13 n.7.

In its final proposal, plaintiff explained why it included an additional set of eleven tools in its vehicle:

> [t]he tools required for B-kit Armor installation are common hand tools available to US service personnel in the General Mechanics Tool Kit (GMTK). The GMTK may not always be available in all field mission conditions, and the tools listed in Figure AZ [the eleven tools] are not part of the standard required BII.  Therefore, we made a trade to include the tools as part of the B-kit.

> AMG believes that the approach does not attribute additional field performance risk to the program.  The tools required to attach the armor will be supplied as part of the B-Kit.  Once the B-Kit is installed on the vehicle, these tools will be stored in the vehicle tool box.  These tools will always be available for service of the kit. These tools will remain with the B-Kit when it is removed from the GMV 1.1.

AR Tab 46.2, at 43802 .

The agency's evaluation of AMG's final proposal on this subfactor resulted in a finding of weakness, as follows:

> AMG has proposed that the tools required for armor installation will be included as part of the Crew Protection Kit, and can be stored in [the] vehicle tool box; <u>however AMG failed to identify the weight of the tools required or validate that the vehicle tool box has sufficient space claim to accommodate those tools which now includes tooling above and beyond the vehicle BII requirement</u>.

AR Tab 59, at 52373 (emphasis added).

Although plaintiff claims the weakness fell outside of the specified evaluation criteria, <u>see</u> Pl.'s Mot. 60, the agency had specified that its evaluation of this subfactor would include "armor mounting procedures. . . [and] <u>tooling required to integrate armor</u>," AR Tab 74.5, at 53231 § M.3.2.2.2.b (emphasis added).

Defendant points out that in its motion, plaintiff provided additional information about its tools that was absent from its proposal.  <u>See</u> Def.'s Mot. 32.  In its motion, plaintiff said that its additional tooling, the eleven tools, "weigh[s] less than 10 pounds," and that the vehicle tool box can accommodate them.  Pl.'s Mot. 59.  But without sufficient information in AMG's proposal about its tools, defendant observed, the agency

simply was not able to determine whether AMG's proposal increased the risk of the proposed solution. See Def.'s Mot. 33. Hence, it still assessed a weakness. Id.

Reviewing courts give the greatest deference possible to these determinations on technical matters, in recognition of the special expertise of procurement officials. See E.W. Bliss Co., 77 F.3d at 449; J.C.N. Const., 107 Fed. Cl. at 510 (same); Beta Analytics Int'l, 67 Fed. Cl. at 395 (same).

It is clear from the record that the agency repeatedly directed AMG to provide more information about its tool kit. While AMG looks upon the issue as "trivial," Pl.'s Mot. 59, its challenge simply reflects its disagreement with the agency. The law provides that "an offeror's mere disagreement with the agency's judgment concerning the adequacy of the proposal is not sufficient to establish that the agency acted unreasonably.'" Banknote Corp. of Am., 56 Fed. Cl. at 384 (internal quotation marks omitted).

The court finds that the agency's evaluation of plaintiff's tool kit for armor installation did not extend beyond the stated criteria. Plaintiff has failed to show that the agency's evaluation was unreasonable, arbitrary or capricious.

5. The Agency's Evaluation of Human Factor Engineering: Capability, Factor 2 (Technical), Subfactor 1 (Vehicle Performance) Was Rational

Plaintiff asserts that the agency's evaluation of its human factor engineering was arbitrary and capricious when it assigned a weakness based on plaintiff's failure to meet five clearance requirements inside the vehicle for 98th percentile males. See Pl.'s Mot. 61-63. Plaintiff asserts that the agency measured its vehicle against clearance standards, known as MIL-STD-1472, which were not specified in the solicitation, and that regardless, plaintiff's vehicle met the specified requirement that it "permit utilization" by a 98th percentile male. See id. at 61-62.

Defendant responds that the solicitation did set forth MIL-STD-1472 as the mandatory standard, the agency uniformly evaluated all offerors against this standard, and the agency correctly found that plaintiff's vehicle fell short of the required clearances on five dimensions. See Def.'s Mot. 30-32. Defendant further argues that to the extent there was any ambiguity in the solicitation, it was a patent ambiguity, and as plaintiff asked for no clarification, any ambiguity must be interpreted against plaintiff. See Def.'s Reply 22.

The court first considers whether MIL-STD-1472 was incorporated in the solicitation, and if so, whether the agency's assessment of a weakness was arbitrary and capricious.

54

a.      The Parties' Arguments Regarding the Solicitation Criteria

The solicitation included both a Statement of Work (SOW) and a Performance Specification (PSpec).  See AR Tab 74.5, at 53088 ¶ 11; 53146, 55676 ¶ B.1.  The SOW set forth detailed work efforts required to provide the agency with the vehicle. See AR Tab 29.3, 4165 ¶ 1.1.  It also included a list of "Military Standards and Specifications – Mandatory Compliance," which was a list of various standards and specifications, including the one at issue here, MIL-STD-1472 Human Engineering.  Id. at 4168.  The PSpecs set forth detailed vehicle performance requirements.  See AR Tab 29.3, 4242 ¶ 3. The agency evaluated human factor engineering according to PSpec 3.1.1.a.  See AR Tab 59, at 52364.

Defendant asserts that by "listing the specification under this 'Mandatory Compliance' heading, the solicitation made clear that all aspects of the proposal were to be held to that specification's requirements."  Def.'s Mot. 30.

Plaintiff states that PSpec 3.1.1.a set forth another standard, known as the NATICK report, and did not expressly reference MIL-STD-1472.  See Pl.'s Mot. 61. PSpec 3.1.1.a provides that "[t]he [vehicle] must be engineered to permit utilization by [a] 5th to 98th percentile male [in accordance with] NATICK report."  AR Tab 29.3, at 4243.

Plaintiff contends that the mandatory compliance reference to MIL-STD-1472 in the SOW is "insufficient to establish that it was to be used to evaluate PSpec 3.1.1.a." Pl.'s Reply 43 n.16.  Plaintiff asserts, without furnishing examples, that the solicitation was filled with requirements that were not part of the evaluation process.  See Pl.'s Reply 43 n.16.

Plaintiff conceded that the NATICK report provided no "clearance distances that allow one to determine whether a vehicle 'permits utilization' by a 98th percentile male." Pl.'s Mot. 61.  Plaintiff explained that because it did not read the solicitation to provide mandatory clearance distances, it opted to demonstrate compliance with the PSpec 3.1.1.a standard by using certain clearances provided in MIL-STD-1472F[19] intended to accommodate "a 95th percentile soldier dressed in Arctic clothing."  Pl.'s Mot. 62. Plaintiff asserts that in using this standard, its vehicle "meets the PSpec requirement that the vehicle 'permit utilization' by a 98th percentile male."  Pl.'s Mot. 62.

---

[19]      The SOW directed that the "most recent revision of the MIL-STD-1472 at the time of the final RFP shall be used."  See AR Tab 29.3, at 4170 § 2.0.  Revisions are noted by a letter suffix, for example MIL-STD-1472F.  There is no significance to references with or without the suffix.

Defendant asserts that MIL-STD-1472 was referenced throughout the solicitation, "instructing offerors to design their vehicle based on the 5th-to-98th percentile parameters that the military standard set out." Def.'s Mot. 31. Defendant points to the SOW:

> 3.5.2  Human Factors Engineering. . . . <u>The Contractor shall identify and execute Human Factors Engineering (HFE) tasks</u>, according to the Human Engineering Program Plan, to ensure that all systems will be designed to account for human capabilities and limitations and shall design systems, equipment, and user interfaces <u>in compliance with established design standards (e.g., MIL-STD-1472F(1))</u>.

AR Tab 29.3, at 4193.

b.      Legal Standards Governing Ambiguity

A court must "consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions." <u>Banknote</u>, 365 F.3d at 1353.  "A contract is ambiguous if it is susceptible of two different and reasonable interpretations, each of which is found to be consistent with the contract language." <u>Community Heating & Plumbing</u>, 987 F.2d at 1578-79; <u>see also</u> <u>C. Sanchez and Son</u>, 6 F.3d at 1544 (same).  "An ambiguity is latent if it is not apparent on the face of the solicitation and is not discoverable through reasonable or customary care." <u>Linc Gov't Servs.</u>, 96 Fed. Cl. at 708.  "A patent ambiguity is present when the contract contains facially inconsistent provisions that would place a reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties." <u>Stratos Mobile Networks</u>, 213 F.3d at 1381.  Such an ambiguity is "obvious, gross, or glaring." <u>Archura LLC</u>, 112 Fed. Cl. at 500 (citing <u>Fulcra Worldwide</u>, 97 Fed. Cl. at 538; <u>H & M Moving</u>, 499 F.2d at 671).

In the circumstance of a patent ambiguity, defendant explains, plaintiff must have sought clarification during the solicitation process, <u>see</u> <u>Def.'s Reply 22</u> (citing <u>Blue & Gold</u>, 492 F.3d at 1313), and as plaintiff failed to do so, the court must reject plaintiff's proposed construction, <u>see id.</u> (citing <u>Linc Gov't Servs.</u>, 96 Fed. Cl. at 708).

c.      The Solicitation Criteria Include Mandatory Compliance with MIL-STD-1472

The agency's direction to offerors regarding "Mandatory Compliance" with MI-STD-1472 was emphasized in text that was bolded and underlined and set out in a heading.  AR Tab 29.3, at 4170 ¶ 2.1 ("Military Standards and Specifications –

56

Mandatory Compliance."). Plaintiff's unsupported assertion that the solicitation was filled with requirements that were not part of the evaluation process is unpersuasive. See Pl.'s Reply 43 n.16. The court gives the term "mandatory compliance" its plain and ordinary meaning. See Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1040-41 (Fed. Cir. 2003) (en banc) ("If the provisions are clear and unambiguous, they must be given their plain and ordinary meaning . . . .") (citation omitted).

Plaintiff acknowledged that it found no clearance standards in the NATICK report, and resorted to a work-around solution by using MIL-STD 1472F standards for "a 95th percentile soldier dressed in Arctic clothing." Pl.'s Mot. 62. Plaintiff does not suggest that the MIL-STD 1472F failed to provide relevant clearance standards. Nor does plaintiff explain how in using the MIL-STD 1472F, as the agency intended, it failed to locate the clearances the agency intended for it to use.

If, in fact, neither the NATICK report nor the MIL-STD 1472F provided clearances for a 98th percentile male, despite the fact that the agency expressly cited to both for use in human factor engineering, that would be a glaring, obvious omission of the type requiring an offeror to seek clarification from the agency. But, here, plaintiff did not seek such clarification.

Because the SOW was part of the solicitation, and because the agency expressly directed mandatory compliance with MIL-STD-1472 in the SOW, the court finds that MIL-STD-1472 was incorporated into the solicitation, without ambiguity. If, however, the court were to have found the solicitation to be ambiguous, the court also would have found that such ambiguity was patent.

d.      The Agency's Assessment of a Weakness Was Rational

It is undisputed that plaintiff did not fully comply with the standards in PSpec 3.1.1a. Defendant identified five dimensions in which plaintiff fell short. See AR Tab 59, at 52365. Plaintiff disputes three of them, but concedes that it failed to meet two dimensions. See Pl.'s Reply 44 ("AMG's vehicle meets the MIL-STD-1472 guidelines for all but two of the dimensions . . . when holding a 98th percentile male.") Plaintiff asserts, however, that the shortcomings were "very small variances," see Pl.'s Mot. 62, which are "operationally insignificant," Id. 63. Plaintiff contends that it showed the agency how its vehicle would permit utilization by a 98th percentile male, despite failing to meet every MIL-STD-1472 standard. See Pl.'s Reply 43-44. Plaintiff adds that such showing should be sufficient and that its assessed weakness was not justified. See id. at 44.

While maintaining its position that plaintiff fell short on five, not two, clearances, defendant notes that the difference in evaluation for which AMG now petitions would not

have mattered because "[f]ailing to meet <u>any</u> space criteria would mean the proposal had a weakness: providing insufficient space for crew is simply not an adequate solution." Def.'s Reply 23.  Defendant points out that plaintiff's attempt to set its own standard for the term "permit utilization" by a 98th percentile male reduces the term to an "amorphous and non-descript concept." <u>Id.</u> at 21.  Defendant explains that rather than allow offerors to set their own individual standards, the agency interpreted "the 'permit utilization' phrase as requiring strict compliance with the relevant military standard [to] ensure[] fair and equal treatment for all offerors." <u>Id.</u>

The court may not substitute its judgment for that of the "agency's with regard to how the contract work should be designed." <u>See, e.g.</u>, <u>Ala. Aircraft Indus.</u>, 586 F.3d at 1376 (citing <u>Motor Vehicle Mfrs.</u>, 463 U.S. at 43).  Rather, reviewing courts give the greatest deference possible to the agency's determinations, in recognition of the special expertise of procurement officials.  <u>See</u> <u>E.W. Bliss Co.</u>, 77 F.3d at 449; <u>J.C.N. Const.</u>, 107 Fed. Cl. at 510 (same); <u>Beta Analytics Int'l</u>, 67 Fed. Cl. at 395 (same).

e.        Conclusion

The agency's decision to interpret the PSpec 3.1.1.a provision to "permit utilization by a . . . 98th percentile male" according to the standards set forth in MIL-STD-1472, as incorporated into the solicitation, is reasonable.  Plaintiff has failed to show that the agency's evaluation was unreasonable, arbitrary or capricious.

V.        THE AGENCY'S EVALUATION OF AMG'S PAST PERFORMANCE WAS RATIONAL

Plaintiff asserts that the agency's evaluation of its past performance was unreasonable, arbitrary, and capricious.  <u>See</u> Pl.'s Mot. 65-68.  Plaintiff claims that it should have received the highest confidence rating, Substantial Confidence, rather than the rating one level below, Satisfactory Confidence, because the agency identified no serious, unresolved issues relating to plaintiff's past performance.  <u>See id.</u> at 65.

Defendant responds that plaintiff overlooks a "critical gap in its prior contracts." Def.'s Mot. 37.  "The reason AMG did not receive the highest rating for past performance was because none of the five prime contracts it submitted met the 'Very Relevant' criteria," owing, at least in part, to the "lack of cost elements in [its] prior contracts." <u>Id.</u> at 37-38.  Pointing to plaintiff's contracts, defendant asserts that a number had no cost element, and that none had the cost complexity of the contract at issue, which contained a complex cost-plus-fixed-fee, cost, and firm-fixed-priced elements.  <u>See id.</u> (citing AR Tab 59, at 52388).

58

When the court considers a challenge to the past performance evaluation conducted in the course of a negotiated procurement, "the greatest deference possible is given to the agency." Gulf Group Inc. v. United States, 61 Fed. Cl. 338, 351 (2004). "[T]he Court's review of an agency's 'evaluations of an offeror's . . . past performance should be limited to determining whether the evaluation was reasonable, consistent with the stated evaluation criteria and complied with relevant statutory and regulatory requirements.'" Plasan N. Am., Inc. v. United States, 109 Fed. Cl. 561, 572 (2013) (quoting Univ. Research Co. v. United States, 65 Fed. Cl. 500, 506 (2005)).

A review of the solicitation shows that the offerors were instructed to "submit information on contracts that are considered relevant in demonstrating the ability to perform the proposed overall effort," and were instructed to "clearly show" program management experience.  AR Tab 74.5, at 53213 § L.3.3.2.1.  The solicitation further provided that in evaluating Past Performance, "the Offeror's demonstrated past performance of contracts of a similar complexity, dollar value, and work requirement will be assessed to determine the demonstrated potential for successful performance of this requirement." Id. at 53222 § M.2.3 (emphasis added).

The solicitation provides that relevancy determinations for past contracts will be determined as follows: a Very Relevant rating requires "Present/Past Performance effort involv[ing] essentially the same scope and magnitude of effort and complexities this solicitation requires;" a Relevant rating requires a "similar scope and magnitude;" a Somewhat Relevant rating requires "some of the scope and magnitude; "and finally a Not Relevant rating requires "little or none of the scope and magnitude." Id. at 53215 tbl. 5 (emphasis added).

Defendant pointed to the SSEB Evaluation Report that spoke directly to the evaluation rating of Satisfactory Confidence that plaintiff received.  See Def.'s Cross-Mot 38.

> The lack of cost elements in some of the reviewed contracts reduced [AMG's] overall relevancy rating.  Past Performance in a cost environment is crucial to the GMV 1.1 effort due to the fact that this entire program is constrained by the contractor's ability to perform integration of complex C4ISR components and SOF-specific requirements in an extremely constrained vehicle environment.

AR Tab 59, at 52382.

The SSEB Evaluation Report for the cost/price portion of AMG's proposal supports defendant's characterization of the contract's pricing as one that was complex, with cost-plus-fixed-fee, cost, and firm-fixed-priced elements.  See id. at 52391-433.

Plaintiff asserts that "[n]othing in the solicitation makes a Substantial Confidence rating dependent upon having Very Relevant contracts." Pl.'s Reply 45. The standard for Substantial Confidence is that the government have a "high expectation that the Offeror will successfully perform the required effort." AR Tab 74.5, at 53235 tbl. 4. While it is true that the confidence rating does not mention Very Relevant contracts, plaintiff continues to overlook the shortcoming that the agency clearly pointed to in its evaluation—the lack of similar cost complexity in its past contracts.

Nothing in the record suggests that a consideration of cost complexity in past contracts was beyond the scope of the evaluation criteria as set forth in the solicitation. Plaintiff's challenge amounts to no more than mere disagreement with the agency's evaluation, and as such, must fail. "[A]n offeror's mere disagreement with the agency's judgment concerning the adequacy of the proposal is not sufficient to establish that the agency acted unreasonably.'" Banknote Corp. of Am., 56 Fed. Cl. at 384 (internal quotation marks omitted).

Plaintiff has failed to show that the agency's evaluation of its past performance was unreasonable, arbitrary, or capricious.

VI.    BEST VALUE TRADEOFF ANALYSIS

The government informed offerors that it intended to award the contract to the offeror "whose offer conforming to the solicitation is determined to represent the 'best value' with appropriate consideration given to the major Areas listed in descending order of importance: Capability, Past Performance and Cost/Price . . . The Government will conduct a tradeoff process in accordance with FAR 15.101-1." AR Tab 74.5, at 53220 § M.1.1.

FAR 15.101-1 states that:

(a) A tradeoff process is appropriate when it may be in the best interest of the Government to consider [an] award to other than the lowest priced offeror or other than the highest technically rated offeror.

(b) When using a tradeoff process, the following apply:

(1) All evaluation factors and significant subfactors that will affect contract award and their relative importance shall be clearly stated in the solicitation; and

(2) The solicitation shall state whether all evaluation factors other than cost or price, when combined, are significantly more important than, approximately equal to, or significantly less important than cost or price.

(c) This process permits tradeoffs among cost or price and non-cost factors and allows the Government to accept other than the lowest priced proposal. The perceived benefits of the higher priced proposal shall merit the additional cost, and the rationale for tradeoffs must be documented in the file in accordance with 15.406.

FAR 15.101-1.

In preparing the Source Selection Decision, the FAR directs that

[t]he source selection authority's (SSA) decision shall be based on a comparative assessment of proposals against all source selection criteria in the solicitation. While the SSA may use reports and analyses prepared by others, the source selection decision shall represent the SSA's independent judgment. The source selection decision shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs. Although the rationale for the selection decision must be documented, that documentation need not quantify the tradeoffs that led to the decision.

FAR 15.308.

A.      Legal Standard Governing Best Value Tradeoff

Procurement officials have substantial discretion in evaluating which proposal represents the best value to the Government.  Blackwater Lodge &Training Ctr., Inc. v. United States, 86 Fed. Cl. 488, 514 (2008) (citing E.W. Bliss Co., 77 F.3d at 449).  Even when a solicitation emphasizes technical merit, an agency "may properly select a lower-priced, lower-technically-rated proposal if it decides that the cost premium involved in selecting a higher-rated, higher-priced proposal is not justified, given the acceptable level of technical competence available at the lower price."  Banknote Corp., 56 Fed. Cl. at 390 (citation omitted).  The Court's main task is to ensure that the agency articulated a "'rational connection between the facts found and the choice made.'"  Id. (quoting Motor Vehicle Mfrs., 463 U.S. at 43 (citation omitted)).  Thus, where agency officials reasonably exercise their discretion when conducting a best value analysis, the Court will not disturb the award.  See E.W. Bliss Co., 77 F.3d at 449.

B.      The Positions of the Parties Regarding the SSA's Tradeoff Analysis

Plaintiff objects to the manner in which the SSA made his decision.  Plaintiff contends that the SSA's decision appears to have been made without considering GDOTS's past performance, "one of the three major source selection criteria, and thus without grappling with the clear possibility that, in light of GDOTS's past performance record, GDOTS would prove unable to deliver the supposedly superior vehicle."  Pl.'s Mot. 21.  Given the SSA's silence on this issue, plaintiff asserts that the SSA either failed to perform a best value tradeoff analysis addressing all relevant factors, or if the SSA performed such an analysis, he failed to document it in the SSDD.  See id. at 20, 24.  In either case, plaintiff asserts the SSA violated FAR 15.308.  See id. at 20.

Defendant argues that given the small price differential between the offers of AMG and GDOTS, and the relative merits of the offers as established by the respective evaluative teams, the SSA satisfied FAR 15.308 when he made a "facial comparison" of the proposals.  See Def.'s Mot. 45-46.  Defendant explained that "[b]ecause [the] technical capability rating was significantly more important than past performance, the proposal with the better technical rating had to prevail."  Def.'s Reply 35 (emphasis added) (internal quotation marks omitted).

Relying on a recent Federal Circuit decision, defendant avers that "exhaustive detail is not required in the source selection authority's decision, so long as that decision reveals that the source selection authority considered the relevant factors."  Def.'s Mot. 45 (citing Croman Corp. v. United States, 724 F.3d 1357 (Fed. Cir. 2013)).  Taking a similar position to defendant, GDOTS urges a reading of Croman that finds "a source selection decision is adequate when it relies on the solicitation's weighting of the evaluation criteria."  Def.-Int.'s Mot. 12.

C.      Discussion

The court considers whether the SSA was required to perform a best value tradeoff analysis, whether the SSA made a comparative assessment of proposals against all source selection criteria in the solicitation using his independent judgment, whether the agency's erroneous evaluation of GDOTS's past performance impacts the best value tradeoff decision, and whether the SSA adequately documented his decision.

1.      Whether the FAR Required the SSA to Perform a Tradeoff Analysis

GDOTS's price proposal was $[XXX] more than AMG's, a price premium of [XXX]%.  See AR Tab 54, at 51220.  Defendant repeatedly argues that given the small price differential between AMG and GDOTS, the SSA's decision was dictated by (1) the relative weights set forth in the solicitation and (2) the ratings the SSEB evaluators

assigned for Capability and, less importantly, Past Performance.  <u>See</u> Def.'s Reply 35.
Defendant argues that

> [t]he <u>absence of any meaningful price distinction</u> between the two
> proposals meant that, for all practical purposes, SOCOM did <u>not</u> have to
> pay a premium for GDOTS's better technical capability rating. . . . <u>On these
> facts</u>, deciding that a proposal with better technical capability delivered the
> best value did not require a lengthy analysis: <u>the solicitation itself dictated
> the answer.  Because technical capability rating was "significantly more
> important" than past performance, the proposal with the better technical
> rating had to prevail.</u>

<u>Id.</u> (emphasis added).  Defendant also claims that

> [b]ased on the solicitation's priorities, the best proposal is obvious.
> GDOTS's proposal was one grade higher than AMG's on the <u>most
> important</u> category, and one grade lower than AMG's on the category that
> was significantly less important.  For nearly the same price, the agency
> could have a better technical approach or a better past performance record.
> Given the agency's stated desire to receive the best <u>technical</u> solution,
> choosing GDOTS over AMG was the right decision to make.

Def.'s Mot. 43.  Defendant further contends that

> [w]ithout a higher price to justify, the analysis required by <u>Serco</u> would
> have been meaningless:  the solicitation defined the outcome, so there was
> no complex business judgment to make.  <u>All the source selection authority
> had to do was pick the proposal that had the best rating on the most
> important category—technical capability.</u>

Def.'s Reply 37 (citing <u>Serco v. United States</u>, 81 Fed. Cl. 463, 468 (2008) (finding a
tradeoff analysis to be arbitrary and capricious because the SSA failed to discuss the
significance of the differences in technical merit in terms of contract performance or
agency needs, and the SSA did not indicate whether the technical advantage was worth
the cost premium)).

In short, defendant argues that the FAR's requirement that the SSA perform a
tradeoff analysis and document his business judgment is not as rigorous when a small
price differential exists between the lowest priced offeror and the technically superior
offeror ultimately selected for the contract award.  <u>See id.</u> at 37.

63

By the terms of the solicitation, the SSA was obligated to conduct a best value tradeoff.  The court considers whether the SSA did so.

> 2.   Whether the SSA Made a Comparative Assessment of Proposals
>      Using His Independent Judgment

The paragraph from the record entitled "Source Selection Decision," is set forth below:

> I have independently reviewed the various elements of the proposal and the discussion results and have determined that an award to General Dynamics Ordnance and Tactical Systems (GDOTS) provides the best value to the Government considering the criteria set forth in the solicitation.  GDOTS provided an outstanding proposal in the highest weighted area, Capability, providing the government an outstanding production and technical proposal.  The Limited Confidence Past Performance assessment and Cost/Price variance in the proposals of a maximum of only [XXX]% did not offset the value offered by the GDOTS proposal to this best value solicitation.

AR Tab 54, at 51220.

Plaintiff argues that in contravention of FAR 15.308, which requires the SSA to consider all source selection criteria when making a comparative assessment of the proposals, the SSA "failed to properly address whether GDOTS presents the best value despite the agency's 'low expectation' that GDOTS can successfully perform."  Pl.'s Mot. 20.  Plaintiff also argues that defendant's limited comparison of the offerors' evaluation ratings "strips the Past Performance rating of its meaning" and thus its utility as an indicator of whether an offeror would actually perform.  Pl.'s Reply 9-10.

Plaintiff questions the sufficiency of the SSA's decision because the SSA failed to address, in depth,  how GDOTS's past performance rating affected his confidence in GDOTS's proposal.  Defendant retorts that "[t]he past performance rating was itself the assessment of risk," and casts plaintiff's criticism of the SSA's decision as a "backdoor" challenge to the lesser weight accorded the past performance factor.  Def.'s Mot. 46.

Having considered previously what an SSA must do when comparing the past performance of offerors, this court has found that FAR 15.308 requires the SSA to "review the agency's evaluations of past performance, ensure their accuracy, compare the results, and then form his or her independent conclusion based on this information." Computer Scis. Corp. v. United States, 51 Fed. Cl. 297, 320 (2002).

This court has also recognized the limitation of a bare evaluation rating, and the need, in certain circumstances, to go beyond the evaluation rating to understand the value provided by the proposal.

> When assessing differences between proposals, the SSA should take into consideration not only the proposals' adjectival ratings but also information on advantages and disadvantages of the proposals. "Looking beyond the adjectival ratings is necessary because proposals with the same adjectival ratings are not necessarily of equal quality."

Mil-Mar Century Corp. v. United States, 111 Fed. Cl. 508, 553 (2013) (internal citations omitted); see also Metcalf Constr. Co., Inc. v. United States, 53 Fed. Cl. 617, 640-41 (2002)(same).

This is true not only when comparing more than one offeror with the same adjectival rating for an evaluation factor, which is not the case here, but also when considering the full impact of a negatively rated evaluation factor on a tradeoff analysis, as in this circumstance.

At oral argument, defendant carefully limited its position to the facts of this case, asserting that if GDOTS had received a rating evaluation one level lower on Past Performance—that is, if GDOTS had received a No Confidence rating rather than the Limited Confidence rating it did receive—the changed circumstance would compel the conduct of a best value tradeoff analysis. See Def.'s Reply 36 ("If another procurement has offerors proposing vastly different prices—or no similar hierarchy of preference— then a detailed best-value analysis would, indeed, be necessary."). As defendant explained in its hypothetical during oral argument:

> [W]e would have had a situation where GDOTS was one step above AMG on the most important, significantly most important, capability, but two steps below AMG on the past performance rating. Now, that's a totally different animal. . . .[W]e're dealing with a situation in which the difference is now not equivalent, and as soon as the difference is not equivalent . . . there's a greater bounds for a best-value judgment.

Hr'g. Tr. 62 (emphasis added).

Defendant's reasoning raises the question of how the SSA would have viewed GDOTS's proposal the closer it came to receiving a No Confidence evaluation rating. Given the four evaluation ratings (Substantial Confidence, Satisfactory Confidence, Limited Confidence, and No Confidence), see AR Tab 74.5, at 53235, it is reasonable to expect that an agency would have a range of confidence levels within any particular

evaluation rating.  An offeror on the low end of a Limited Confidence rating, one that barely avoided a No Confidence rating, would have the same confidence rating as an offeror on the high end of the Limited Confidence rating, one that barely missed a Satisfactory Confidence rating.  But these offerors would present the agency with very different expectations that each would successfully perform the required effort.  The past performance ratings would be facially equal, but the risks would be quite different.

While consideration of the evaluation rating alone would be insufficient to determine where GDOTS stands on the spectrum of Limited Confidence ratings, the SSA's evaluation of the underlying information, as provided in the SSEB Evaluation Report and SSAC Comparative Analysis, would enable the SSA to make this determination.  Consistent with the requirement of the FAR, the SSA would render a "source selection decision . . . [that is representative of] the SSA's independent judgment."  FAR 15.308.

Criticizing the SSA's summary mention of the offerors' evaluation ratings without addressing, in any detail, the underlying information that informed these qualitative appraisals, plaintiff challenges the adequacy of the SSA's decision in this case.

Defendant characterizes this criticism as AMG's disagreement with the weight accorded to this evaluation factor in the solicitation, stating that:

> AMG . . . claim[s] that the source selection authority should have weighed GDOTS's technical proposal against the risk of its "Limited Confidence" past performance rating.  See Pl. Reply at 9-10.  But the weight given to past performance was defined by the solicitation. The source selection authority could not give past performance more weight.

Def.'s Reply 37.

Defendant is correct that the solicitation defined the weight of the factors. Nonetheless, the FAR does require, in a tradeoff analysis, that consideration is given to the impact of all the factors identified in the solicitation.

The solicitation in this case weighted the various areas, factors and subfactors to be considered by the agency, and the agency evaluated the offerors on the respective areas, factors and subfactors.  Based on the importance assigned to the evaluation factors and based on the agency's evaluation of the offerors, the court finds that the SSA satisfactorily reflected an independent contemplation of the comparative merits of the proposals.  The reference to GDOTS's Limited Confidence rating in the area of Past Performance and the less than XXXXXX price variance, and to GDOTS's outstanding

technical proposal, as supported by the agency's documented findings, was sufficient to convey the SSA's independent judgment.

### 3.  What is the Impact of a Flawed Evaluation on a Tradeoff Analysis

As earlier determined, the agency's evaluation of GDOTS's past performance was flawed, because the agency considered the past performance of six subcontractors who were not major subcontractors, as well as three Not Relevant contracts for its one major subcontractor.  See supra pt.  III. C.-D.  The SSA expressly pointed to the past performance of GDOTS's subcontractors in his SSDD:

> The low expectation of successful performance of GDOTS, due to the lack of its relevant past performance, is mitigated by the strong performance of its subcontractors which have a significant role in the contract.  GDOTS's GMV 1.1 subcontractors had multiple relevant contracts and were rated very positively; this includes one subcontractor that is proposed to perform 25% of the total contract effort as a major subcontractor.

AR Tab 54, at 51218.

The agency's consideration of the past performance of GDOTS's subcontractors was contrary to the solicitation criteria and thus constituted error.  This error, however, does not render the tradeoff analysis irrational, or arbitrary. The record contains adequate support for the SSA's decision.  The errors made by the agency are not sufficient grounds for rejecting an entire procurement when the decision was otherwise reasonable.  See, e.g., Grumman Data Sys. Corp. v. Widnall, 15 F.3d 1044, 1048 (Fed. Cir. 1994).

And as discussed more fully in the section addressing prejudice, see supra pt. VII, "[w]hen a challenge is brought [based on a violation of regulation or procedure], the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations."  Impresa, 238 F.3d at 1332 (citations and quotations omitted); accord Croman Corp., 724 F.3d at 1363; Emery Worldwide Airlines, 264 F.3d at 1085–86.  Moreover, the protestor's burden is "especially heavy" in the context of "[n]egotiated procurements [that] afford the contracting officer a breadth of discretion" and "best value awards [that] afford the contracting additional discretion."  Croman Corp. v. United States, 106 Fed. Cl. 198, 216 (2012), aff'd, 724 F.3d 1357 (Fed. Cir. 2013).

The court cannot find that the agency's error in its evaluation of GDOTS's past performance, an area with significantly less importance, renders the best value determination arbitrary or capricious.  The agency rightfully placed greater weight on the most important Capability area, in accordance with the solicitation, in its best value determination.

4.      Whether the SSA Adequately Documented his Decision

Plaintiff argues that even if the SSA did perform a best value tradeoff analysis, he failed to document his rationale in his SSDD or explain his reasoning.  See Pl.'s Mot. 24-29.

Defendant points to the "four detailed pages on the strengths and weaknesses contained in each proposal," and the summary chart of the same information included in the SSA's decision, as evidence that the SSA provided a sufficient rationale.  Def.'s Mot. 43-44.  Defendant asserts that the SSA's decision "detail[ed] the path of the agency's decision-making" which resulted in the agency's picking of the proposal with the better technical rating.  Def.'s Reply 35-36.

As support for the SSA's decision, Defendant and GDOTS rely heavily on a recent decision from the Federal Circuit, Croman Corporation v. United States, which they characterize as standing for the proposition that "exhaustive detail is not required in the source selection authority's decision, so long as that decision reveals that the source selection authority considered the relevant factors."  Def.'s Mot. 45 (citing Croman Corp., 724 F.3d at 1357; see also Def.-Int.'s Mot. 6-9.  The court does not disagree—provided the SSA has considered the relevant factors, and the rationale for the SSA's decision can be discerned from the decisional documents.

In Croman, the plaintiff challenged the SSA's tradeoff analysis as inadequate, arguing that the record contained "no declarations or the like by the SSA as to the relative strengths he found in any [of the] proposal(s)."  Croman, 724 F.3d at 1365.  Central to the Federal Circuit's determination that the tradeoff analysis satisfied FAR 15.308, was the SSA's reliance on two documents that were attached to his decision.  See id. ("In particular, Attachments 4 and 7 include information that fully satisfies the requirements of FAR 15.308.").

The two documents, Attachments 4 and 7, both included proposal evaluation information generated by the agency's computerized optimization model (OM).  As configured, the OM performed a mathematical computation that yielded a set of recommended awards based upon the importance the agency assigned to the evaluation factors used in the procurement.  See id. at 1361.

The Federal Circuit described Attachment 4 as "a spreadsheet of OM evaluation results," which "present a side-by-side comparison of each offer, and therefore, the strengths and weaknesses of each proposal as reflected in the ratings assigned by [technical evaluation team] members."  Id. at 1365.  GDOTS observes that this attachment is like the overall assessment table included in the SSDD, see Def.-Int.'s Mot. 16-17 (citing AR Tab 54, at 51220). The court agrees.

The information and analysis included in Attachment 7, however, is unlike anything in this case, and it is on the basis of this information that <u>Croman</u> is factually distinct from this case. Attachment 7 was titled "Tradeoff Analysis Comparing OM Assignments . . . between weighted solution and 3 single objective optima," and it contained actual, detailed tradeoffs, in which some degree of technical superiority was traded for a lower price. <u>Croman</u>, 724 F.3d at 1366. The Federal Circuit found that FAR 15.308 was "fully satisfie[d]" by the information contained in attachments 4 and 7. <u>Id.</u> at 1365. Sufficient detail for a FAR 15.308 comparative assessment was present in <u>Croman</u>, in the attachments. <u>See</u> <u>Croman</u>, 724 F.3d at 1365.

Although the factual circumstances in this case are different than in <u>Croman</u>, the reasoning in <u>Croman</u> is instructive here. The SSDD in this record is a five-page document, with four separate sections devoted to Background, the Evaluation Process, the Evaluation Results for Navistar, GDOTS and AMG, and finally the Source Selection Decision. AR Tab 54, at 51216-20. The first two sections are true to their titles. The third section, Evaluation Results, provides summaries for the evaluations of each offeror on Capability, Past Performance and Cost. <u>See</u> <u>id.</u> at 51217-19. The SSA also reproduced a table included in the SSAC Comparative Analysis, <u>see</u> AR Tab 55A, at 51246, in which each factor and subfactor is highlighted in its color adjectival rating, and includes the number of strengths, significant weaknesses, weaknesses and deficiencies for each. <u>See</u> AR Tab 54, at 51220. Past Performance ratings and total cost/price are also provided. <u>See</u> <u>id.</u> The SSA makes no comparisons among the three offerors, rather, each is discussed separately.

In the Source Selection Decision, the SSA states:

I have independently reviewed the various elements of the proposal and the discussion results and have determined that an award to General Dynamics Ordnance and Tactical Systems (GDOTS) provides the best value to the Government considering the criteria set forth in the solicitation. GDOTS provided an outstanding proposal in the highest weighted area, Capability, providing the government an outstanding production and technical proposal. The Limited Confidence Past Performance assessment and Cost/Price variance in the proposals of a maximum of only [XXX]% did not offset the value offered by the GDOTS proposal to this best value solicitation.

<u>Id.</u>

While the SSA's documentation in this case is not as robust as that of the agency's in the Croman case, the court finds that the SSA here adequately documented his decision such that the court could determine the basis on which his decision was made.

The court is persuaded that the agency satisfied its responsibility under the FAR and the solicitation in conducting a best value analysis and recording the reasons for the decision. The agency awarded the contract to the irrefutably highest technically rated offeror, and the SSA documented his view that neither the price variance nor the past performance ratings disturbed the value to the government presented by the offeror with an outstanding proposal in the most heavily weighted of the evaluative factors.

D.      Conclusion

The court does not find that the SSA violated FAR 15.308, as plaintiff has alleged. Nor does the court find that the errors in the agency's evaluation of the lesser weighted Area rendered the tradeoff analysis irrational and arbitrary.

VII.    THE AGENCY'S ERRORS CAUSED NO PREJUDICE TO AMG

To prevail in a bid protest, plaintiff must do more than show the agency erred in the procurement process. Plaintiff must also show that it was prejudiced by those errors, that "there was a 'substantial chance' it would have received the contract award but for [the agency's] errors in the bid process." Bannum, Inc., 404 F.3d at 1358. "This test is more lenient than showing actual causation, that is, showing that but for the errors [plaintiff] would have won the contract." Id. However, the protestor must do more than show a "mere possibility" that but for the agency errors, it "would have received the contract." Data General Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996). Plaintiff's showing must be made by a preponderance of the evidence. See, e.g., Davis Boat Works, Inc. v. United States, 111 Fed. Cl. 342, 349 (2013).

Plaintiff has shown two errors on the part of the agency during the procurement process. First with regard to the agency's evaluation of GDOTS's past performance, the agency erred in considering eight contracts for six non-major subcontractors, and it erred in considering three Not Relevant contracts for its one major subconstractor, Flyer. See supra pt. III. C.-D. Second, with regard to the agency's evaluation of AMG's Capability area, the agency erred when it assigned plaintiff Weakness-27 for Factor 2 (Technical), Subfactor 1 (Vehicle Performance). See supra pt. IV. C. 3.

Plaintiff makes two prejudice arguments specifically regarding Weakness-27, first that the elimination of any one weakness could have affected the best value tradeoff analysis, see Pl.'s Mot. 70, and second, that the elimination of the weakness could have

led to a higher rating on Factor 2, see Pl.'s Mot. 50, which ultimately would have impacted the agency's best value determination.

Plaintiff asserts that correction of "any of the flaws in the agency's evaluation and award decision would have had an impact on the outcome of the best value analysis." Pl.'s Mot. 69.  In particular, plaintiff argues that "correction of any of the three weaknesses assigned to AMG under Factor 2 . . . could have raised AMG's ratings on the underlying subfactors or the factor overall, which again could have resulted in a conclusion that AMG's proposal presents the best value."  Pl.'s Mot. 71.

The question the court now considers is whether, if the agency had not erred, AMG would have had a substantial chance to receive the contract.

GDOTS's proposal received the highest score—Outstanding—on the most important factor, Capability.  See AR Tab 54, at 51220.  GDOTS received a total of 30 strengths, 1 weakness and no significant weaknesses or deficiencies.  See id.  In comparison, AMG received a total of 19 strengths, 5 weaknesses, and no significant weaknesses or deficiencies.  See id.

It is simply too speculative to think that if AMG's strength/weakness tally had been 19 strengths and 4 weaknesses, instead of 19 strengths and 5 weaknesses, that the difference would have had an impact on the SSA's best value tradeoff analysis.  In the face of GDOTS's 30 strengths in the Capability area, whether AMG had 4 or 5 weaknesses was unimportant to the outcome of the SSA's best value tradeoff analysis.

Plaintiff also asserts that if the agency had evaluated it correctly with regard to Factor 2, it would have received a Good rating, rather than the Acceptable rating it did receive.  See Pl.'s Mot. 50.  Within Factor 2, Subfactor 1 (Vehicle Performance) and Subfactor 2 (Systems Integration/Engineering), were of equal importance.  See AR Tab 74.5, at 53221-22 §§ M.2.1, M.2.2.3.  On Subfactor 1 (Vehicle Performance), plaintiff received 4 strengths and 3 weaknesses, and was rated Acceptable.  See AR Tab 54, at 51220.  On Subfactor 2, plaintiff received 2 strengths and 1 weakness, and was also rated Acceptable.  See id.  Review of the evaluation ratings for all three offerors shows that where an offeror had even one weakness on a subfactor, the highest rating the agency awarded for that subfactor was Acceptable.  See id.  It was thus unlikely that AMG would have received a Good rating on Subfactor 1, but for Weakness-27, given that it would have had two remaining weaknesses.

Assuming the best case scenario for plaintiff, that in the absence of Weaknesss-27 the agency did rate AMG as Good on Subfactor 1, AMG would still be left with its Acceptable rating on Subfactor 2.  With Subfactors 1 and 2 equally weighted, it is highly speculative that AMG would have been able to raise its Factor 2 rating to Good.  Even

assuming it did so, with a Good rating on Factor 2, AMG would then have had a Good rating on Factors 1, 2 and 3, which would have resulted in a Good rating on Capability area. But AMG already received a Good rating in the Capability area. See id. AMG thus had no chance to increase its Capability rating beyond the rating it received.

With the elimination of the subcontractor contracts considered outside the solicitation evaluation criteria, GDOTS submitted three contracts for itself, one rated Very Relevant, and two rated Somewhat Relevant, and one contract for Flyer rated Somewhat Relevant. See AR Tab 59, at 52268-69. GDOTS's customer evaluations on Technical, Schedule, Cost, and Management were mixed, with some Excellent and Very Good ratings, but also some Marginal and Satisfactory ratings. See id. GDOTS did seem to engender customer loyalty, however, as in five out of six evaluations[20] the customer said it either probably or definitely would award the contract to GDOTS. See id. The one contract for Flyer, while rated Somewhat Relevant, had all excellent ratings and the customer said they definitely would rehire Flyer. See id. at 52268.

On the whole, when considering (1) the weight the solicitation places on the Capability Area—significantly more important than Past Performance; (2) the significant advantage GDOTS provided over AMG in Capability—30 strengths/1 weakness for GDOTS as compared with 19 strengths/4[21] weaknesses for AMG; (3) GDOTS's four contracts with mixed performance ratings—but good customer loyalty; and finally, (4) the very small cost difference between the proposals, the court is not persuaded that AMG would have had a substantial chance to have received the contract.

The court finds that plaintiff has failed to show it was prejudiced by the agency's errors during the procurement process.

As plaintiff has not succeeded on the merits of its claim, injunctive relief is inappropriate. See, e.g. Centech Grp., Inc. v. United States, 554 F.3d 1029, 1036-37 (Fed. Cir. 2009). The court denies plaintiff's request for an injunction.

Plaintiff also requested its bid and proposal costs. See Pl.'s Mot. 74-75. As plaintiff has not succeeded on the merits of its claim, recovery of bid and proposal costs is unwarranted. See, e.g., PGBA, LLC, 60 Fed. Cl. at 222. The court denies plaintiff's request for the recovery of its bid and proposal costs.

---

[20]    Contracts can span a number of years and some had more than one customer evaluation. See AR Tab 59, at 52268-69.

[21]    As revised in this opinion.

VIII.   CONCLUSION

While AMG has shown error in the agency's procurement process, it has failed to show that it was prejudiced by those errors.  AMG's motion for judgment on the administrative record is **DENIED**, defendant's cross-motion for judgment on the administrative record is **GRANTED** and defendant-intervenor's cross- motion for judgment on the administrative record is **GRANTED**.  The Clerk of Court shall enter judgment for defendant and defendant-intervenor.  No costs.

IT IS SO ORDERED.

s/ Patricia Campbell-Smith
PATRICIA CAMPBELL-SMITH
Chief Judge